Matthew G. Ball (SBN 208881)
matthew.ball@klgates.com
Andrew J. Wu (SBN 326268)
andrew.wu@klgates.com
**K&L GATES LLP**
4 Embarcadero Center, Suite 1200
San Francisco, California 94111
Telephone: +1 415 882 8200
Facsimile: +1 415 882 8220

Amy Wong (SBN 298847)
amy.wong@klgates.com
**K&L GATES LLP**
1 Park Plaza, Twelfth Floor
Irvine, California  92614
Telephone: +1 949 253 0900
Facsimile: +1 949 253 0902

Attorneys for Plaintiff
COMPU-LINK CORPORATION,
DBA CELINK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMPU-LINK CORPORATION, DBA CELINK, a Michigan Corporation<br><br>Plaintiff,<br><br>vs.<br><br>PHH MORTGAGE CORPORATION, a New Jersey Corporation,<br><br>Defendant. | Case No. 2:22-cv-00983-KJM-KJN<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1. **BREACH OF CONTRACT (NON-COMPETE)**<br>2. **REFORMATION OF CONTRACT**<br>3. **BREACH OF CONTRACT (NON-SOLICITATION)**<br>4. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>5. **FRAUDULENT INDUCEMENT**<br>6. **INDUCEMENT OF BREACH OF CONTRACT**<br>7. **TORTIOUS INTERFERENCE WITH CONTRACT**<br>8. **NEGLIGENT INTERFERENCE WITH CONTRACT**<br>9. **INDEMNIFICATION**<br>10. **UNJUST ENRICHMENT**<br><br> **JURY TRIAL DEMANDED**<br><br>Hon. Kimberly J. Mueller |

Plaintiff Compu-Link Corporation dba Celink ("Plaintiff" or "Celink"), a Michigan corporation, by and through its counsel, brings this action against Defendant PHH Mortgage Corporation ("Defendant" or "PHH"), a New Jersey corporation, and alleges as follows:

## NATURE OF THE ACTION

1.     This action arises out of PHH's bad faith conduct and covert scheme to enter the reverse mortgage subservicing industry by breaching its restrictive covenants with Celink and improperly interfering with Celink's subservicing contracts and business relationships with its clients, with the intention (and result) of diverting a substantial portion of Celink's business to itself.

2.     Celink is a reverse mortgage subservicer.  By leveraging its proprietary reverse mortgage servicing platform, Celink subservices reverse mortgage loans for entities that own reverse mortgage loans or own the rights to service them.

3.     PHH originates and acquires reverse mortgage loans and reverse mortgage servicing rights but, until recently, did not itself possess any reverse mortgage subservicing capabilities. Therefore, PHH would depend on subservicers, such as Celink, to subservice reverse mortgage loans on its behalf.

4.     From July 2017 through July 2020, Celink subserviced PHH's reverse mortgage loans.  Their subservicing agreement contained a non-compete covenant (which, at PHH's insistence, later became a non-solicitation covenant) that prohibited PHH from engaging in the business of subservicing reverse mortgage loans (or soliciting Celink's clients, per the non-solicitation covenant) during the term of the agreement.

5.     Notwithstanding these restrictive covenants, upon information and belief, PHH entered into negotiations to acquire a reverse mortgage servicing platform and the associated subservicing contracts ("RMS Platform") that one of Celink's clients, Mortgage Assets Management, Inc. ("MAM"), had acquired from Reverse Mortgage Solutions ("RMS").

6.     Upon information and belief, PHH conditioned its offer to purchase the RMS Platform on MAM and its affiliate, Waterfall Asset Management, LLC ("WAM") (also a Celink client), entering into subservicing agreements with PHH, effectively siphoning loans away from Celink that it was already subservicing on behalf of WAM and MAM.  PHH knew or should have

known Celink was subservicing MAM and WAM's reverse mortgage loans, and that MAM and WAM would need to breach their respective subservicing contracts with Celink to ultimately transfer the subservicing of those loans to PHH.  PHH wrongfully and deceptively diverted these loans away from Celink for its own benefit.

7.     PHH and Celink's agreements were due to expire on July 1, 2020.  PHH knew that, given the required regulatory approvals, it would take 12-18 months to complete the aforementioned acquisition of the RMS Platform.  PHH needed Celink to continue subservicing its loans until then.  Through material misrepresentations and omissions, PHH fraudulently induced Celink to continue subservicing its loans for this period.  Meanwhile, PHH was soliciting Celink's clients, MAM and WAM, and caused them to issue pretextual notices to Celink demanding that Celink transfer the subservicing of approximately 25,000 loans to the RMS Platform, so that PHH could ultimately subservice those loans instead of Celink.

8.     Celink had no choice but to succumb to the pressure exerted by MAM and WAM over the next several months, and eventually was forced to transfer the subservicing of about 25,000 MAM and WAM loans to the RMS Platform in May 2021.  Upon information and belief, PHH orchestrated this mass departure of loans before publicly announcing in June 2021—*just one month later*—that PHH had contracted to acquire the RMS Platform and became the exclusive subservicer of MAM's loans for a five-year term.  As a result of PHH's wrongful conduct, Celink has lost at least $6.9 million in subservicing revenue.

9.     Upon information and belief, PHH induced MAM to breach its subservicing agreement with Celink that gave Celink the exclusive right to subservice about 14,000 of the loans it was wrongfully forced to transfer to the RMS Platform.

10.     Upon information and belief, PHH also induced WAM to violate Celink's contractual right to submit the first bid regarding reverse mortgage portfolios that MAM might acquire in the future.  Pursuant to Celink and WAM's contract, MAM must accept Celink's proposal to subservice reverse mortgage portfolios that MAM acquires unless it receives a materially better offer.  Because PHH recently entered into a five-year exclusive subservicing contract with MAM, Celink has been denied its contractual right to submit a first bid on new loans that MAM acquires.  Accordingly,

PHH induces a breach of WAM's contract with Celink every time MAM acquires additional loans from others.

11.     Celink brings this action to recover significant damages due to PHH's breaches and bad faith conduct alleged herein, including but not limited to: millions of dollars in lost subservicing revenue; disgorgement of PHH's profits obtained through its wrongful conduct; the revenue from which PHH has been unjustly enriched; diminution in Celink's franchise value; punitive damages; and total costs of suit, expenses, and attorney's fees incurred herein.

## THE PARTIES

12.     Celink is a Michigan corporation with its principal place of business in Lansing, Michigan.  Celink is owned by Casa Holdco LP, a Delaware limited partnership.

13.     Defendant PHH is a New Jersey corporation with its principal place of business in New Jersey.  PHH is a wholly owned subsidiary of Ocwen Financial Corporation, a Florida corporation with its principal place of business in West Palm Beach, Florida.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity exists between the parties, and the amount in controversy exceeds $75,000.

15.     This Court has personal jurisdiction over PHH because PHH agreed to submit to the jurisdiction of the United States District Court for the Eastern District of California.  Section 8.05(a) of the Reverse Mortgage Subservicing Agreement, dated July 1, 2017, as amended, by and between PHH and Celink, which forms the basis for Celink's claims, provides, in relevant part:

> The Parties submit to the jurisdiction of the courts of Sacramento County in the State of California and the United States District Court for the Eastern District of California (if applicable and appropriate) to enforce its rights under this Article VIII.

16.     The Court also has personal jurisdiction over PHH because PHH engages in business within this judicial district.  Thus, the Court can properly exercise personal jurisdiction under California's long-arm statute, Cal. Code Civ. Proc § 410.10, and under the constitutional doctrine of a defendant's "minimum contacts" with the forum state.

17.     Venue for this action is proper in this judicial district under 28 U.S.C. § 1391

because the parties consented to submit to the jurisdiction of the Eastern District of California.

18.     Section 10.02 of Celink and PHH's subservicing agreement, which forms the basis for Celink's claims, provides:

> THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, AND THE OBLIGATIONS, RIGHTS, AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS, WITHOUT GIVING EFFECT TO ANY CHOICE-OF-LAW RULES THAT MAY REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

## FACTS COMMON TO ALL CLAIMS

**A.      REVERSE MORTGAGE LOANS**

19.     A reverse mortgage loan is a loan available to borrowers aged 62 or older that allows them to borrow money against the value of their home.  No repayment of the mortgage is required until a default event under the terms of the mortgage occurs, the borrower dies, the borrower moves out of the home, or the home is sold.  Upon a maturity even or event of default, the loan is either repaid by the borrower's estate or by the sale of the property securing the loan.

20.     Given the unique properties of reverse mortgage loans and the complex regulatory framework for the servicing of such loans, the processes for servicing/subservicing reverse mortgage loans differ significantly from those for conventional forward mortgages.  Mortgage companies often lack the infrastructure to manage the complex tasks required to service loans.  A number of entities, including Celink, specialize in handling the tasks necessary to service reverse mortgage loans.

21.     The contractual right to service a loan portfolio and receive the related servicing fees is called "mortgage servicing rights" or "MSRs."  MSRs have substantial monetary value and are bought and sold in the secondary mortgage market.  The owner of MSRs is referred to as the loan servicer.

22.     If a servicer lacks the infrastructure needed to perform all tasks necessary to comply with applicable legal, regulatory, and contractual requirements, it can contract with a third party to perform some or all of these tasks on its behalf for a fee.  An entity that handles servicing tasks on behalf of a servicer is called a "subservicer."

**B.    CELINK'S BUSINESS**

23.    Celink was founded in 1969 as a forward mortgage loan subservicer.  In 2005, Celink began subservicing reverse mortgages on behalf of mortgage servicers.  In 2011, Celink exited the forward subservicing business to focus exclusively on subservicing reverse mortgages, which is a highly specialized process.

24.    Celink is approved by Fannie Mae and licensed by the Department of Housing and Urban Development to service/subservice reverse mortgage loans.  Celink subservices reverse mortgage loans using a proprietary platform which supports both HECM[1] and non-HECM reverse mortgage products.

**C.    CELINK'S RELATIONSHIP WITH PHH AND ITS PREDECESSORS**

25.    PHH's parent company, Ocwen Financial Corporation (**"Ocwen"**), is one of the largest non-bank originators and servicers of conventional and reverse mortgage loans.  Until 2019-2020, Ocwen originated reverse mortgage loans through a wholly-owned subsidiary, Liberty Home Equity Solutions, Inc. (**"Liberty"**).  Ocwen also acquired reverse mortgage MSRs through another subsidiary, Ocwen Loan Servicing, LLC (**"OLS"**).

26.    On July 1, 2017, Celink entered into subservicing agreements with Liberty (**"Liberty SSA"**) and OLS (**"OLS SSA"**) (collectively, the **"Ocwen Agreements"**).  These contracts were identical in all material respects.

27.    Both Ocwen Agreements made Celink "the sole and exclusive reverse mortgage servicer and subservicer that is engaged or otherwise utilized by [Liberty/OLS] to service or subservice [reverse mortgage loans] once boarded with Celink" for the term of the agreements. (Ocwen Agreements, Section 2.01(j)).

28.    The "Term" under both Ocwen Agreements was three years, commencing on July 1, 2017.  (Ocwen Agreements, Section 6.01).

---

[1] HECM stands for Home Equity Conversion Mortgage.  HECM loans are commonly sold to the Federal National Mortgage Association ("Fannie Mae") and the Government National Mortgage Association ("Ginnie Mae").  Fannie Mae and Ginnie Mae promulgate their own rules and guidelines for the origination and servicing of HECM loans sold to these agencies.

29.     Section 8.07(b) of the Ocwen Agreements contained a non-compete covenant that prohibited Liberty and OLS from engaging in the business of subservicing reverse mortgage loans during the term of the agreements, plus one year following the term.  Section 8.07(b) provided, in relevant part:

> Because of Celink's legitimate business interest as described herein and the good and valuable consideration offered to [OLS/Liberty], the receipt and sufficiency of which is acknowledged, during the Term ***and for one year following such Term***, [OLS/Liberty] agrees and covenants not to engage in Prohibited Activity within the United States, including its territories and possessions. For purposes of this non-compete clause, "**Prohibited Activity**" is the business of subservicing HECM loans. Prohibited Activity also includes activity that may require or inevitably require disclosure of Celink's Information (as defined in Article VIII) or its Intellectual Property Rights. Nothing herein shall prohibit [OLS/Liberty] from purchasing or owning less than five percent (5%) of the publicly traded securities of any corporation that engages in the subservicing of HECM loans, provided that such ownership represents a passive investment and that [OLS/Liberty] is not a controlling person of, or a member of a group that controls, such corporation.

(Emphasis added).

30.     In 2018, Ocwen acquired PHH Corporation (Defendant PHH's parent), a large originator and servicer of mortgage loans.  On June 6, 2019, Ocwen merged OLS into PHH.  PHH was the surviving entity.  By operation of law, PHH became the counterparty to the OLS SSA.  Accordingly, the OLS SSA is referred to hereinafter as the **"PHH SSA"**.

31.     Liberty continued to exist as a separate subsidiary of Ocwen until about March 15, 2020, when it became a division of PHH.  Celink's relationship with Liberty continued to be governed by the Liberty SSA until July 1, 2020, when Liberty assigned its rights, title, and interest under the Liberty SSA to PHH, which effectively merged the Liberty SSA into the PHH SSA.

32.     Pursuant to Section 8.07(b) (*see supra* at ¶ 29), although the initial three-year term of the PHH SSA was not due to expire until July 1, 2020, PHH was bound by the non-compete covenant from July 1, 2017 to July 1, 2021.

D.     CELINK'S RELATIONSHIP WITH WAM AND MAM

33.     During the 2017-2020 period in which Celink subserviced reverse mortgage loans on behalf of OLS/Liberty/PHH, it also subserviced reverse mortgage loans on behalf of other clients, including Waterfall Asset Management, LLC (**"WAM"**) and Mortgage Assets Management, LLC

("**MAM**").

34.     WAM is an SEC-registered investment advisor that acquires mortgage servicing rights as well as forward and reverse mortgage loans from third parties, securitizes them, and manages them on behalf of security holders.

35.     MAM is a joint venture entity created by Celink and WAM for purposes of purchasing and owning mortgage servicing rights.

### Celink and WAM's Subservicing Agreements (WAM SSAs)

36.     In or around 2012, Celink began subservicing reverse mortgage loans on behalf of WAM, pursuant to several subservicing agreements (collectively, "**WAM SSAs**"), including:

- Amended and Restated Reverse Mortgage Subservicing Agreement dated as of July 6, 2016, by and among Celink, WVMF Funding, LLC, Waterfall Victoria Master Fund, Ltd., SHAP 2015-1 Grantor Trust, Series A, WF AAG, LLC, WF AAG Trust, WF Victoria Grantor Trust 2016-2 (and various other parties joined thereto from time to time)
- Servicing Agreement dated as of July 6, 2018, by and among Celink, as servicer, Cascade Funding RM1 Acquisitions Grantor Trust, as Owner, Cascade Funding RM1 Alternative Holdings, LLC, as Alternative Holdings Entity, Waterfall Asset Management, LLC, as Asset Manager, and U.S. Bank National Association as Paying Agent
- Servicing Agreement dated as of November 9, 2018, by and among Celink, as Servicer, Cascade Funding Mortgage Trust 2018-RM2, as Owner, Waterfall Asset Management, LLC, as Asset Manager, and U.S. Bank National Association as Paying Agent
- Servicing Agreement dated as of June 28, 2019, by and among Celink, as Servicer, Cascade Funding Mortgage Trust 2019-RM3, as Owner, Waterfall Asset Management, LLC, as Asset Manager, and U.S. Bank National Association as Paying Agent

### Celink and WAM Jointly Bid on CIT Bank's Assets

37.     In or around July 2016, Celink and WAM learned that CIT Bank was selling its reverse mortgage business, which did business as "Financial Freedom."  The key assets included certain software, furniture, fixtures, equipment, and a sublease of Financial Freedom's office space, and mortgage servicing rights for a portfolio of reverse mortgage loans ("**CIT Loans**").

38.     Celink partnered with WAM to bid jointly on CIT's assets.  Their proposal contemplated that WAM and Celink would create a joint venture entity (MAM) to purchase and own the CIT Loans and function as an "Operating Advisor."  Celink would then enter into a

subservicing agreement with Operating Advisor (MAM) to subservice the CIT Loans.

39.    CIT accepted, and Fannie Mae approved Celink and WAM's proposal.

**Celink and MAM's Subservicing Agreement (MAM SSA)**

40.    On September 29, 2017, Celink and WAM (through its subsidiary SHAP 2018-1, LLC) formed their joint venture entity, MAM, to serve as the Operating Advisor for the CIT Loans (*see supra* at ¶ 38).

41.    On October 6, 2017, MAM entered into a Mortgage Servicing Rights Purchase and Sale Agreement with CIT Bank.

42.    On December 1, 2017, Celink and MAM entered into a Reverse Mortgage Subservicing Agreement (**"MAM SSA"**), effective as of June 1, 2018.

43.    Section 2.01(l) of the MAM SSA gives Celink the exclusive right to subservice CIT Loans (**"Exclusivity Right"**):

> At all times during the Term, Celink shall be the sole and exclusive reverse mortgage subservicer that is engaged or otherwise utilized by [MAM] with respect to the [CIT Loans] subject to the terms of this Agreement.  No Person (other than the Servicer or its affiliates designated in writing to Celink prior to the Effective Date) shall administer, perform or conduct, in any manner whatsoever, the servicing or subservicing function with respect to any Loan for which the mortgage servicing rights are, at any time during the Term, owned or held by the Servicer.

44.    Pursuant to Section 6.01 of the MAM SSA, the "Term" consisted of an initial five-year term, plus successive five-year periods that would renew automatically until the agreement was terminated by either party:

> This Agreement shall continue for five (5) years from the initial Transfer Date [of June 1, 2018], automatically renewing for successive five (5) year periods until terminated in accordance with Section 6.01, Section 6.02, or Section 6.03 hereof (the "Term").  . . . If either Party provides written notice of termination at least ninety (90) days before the end of a Term, this Agreement shall terminate on the last day of such Term.

45.    Thus, Celink had an exclusive right to subservice the CIT Loans for at least the initial five-year term, from June 1, 2018 to June 1, 2023.

46.    Nothing in Sections 6.01, 6.02, or 6.03 of the MAM SSA permits MAM to terminate the MAM SSA without cause.

47.     On June 1, 2018, Celink began subservicing CIT Loans pursuant to the MAM SSA.

**Celink and WAM's Joint Venture Agreement (JVA)**

48.     On December 1, 2017, Celink and WAM entered into an Amended and Restated Joint Venture Letter Agreement (**"JVA"**) setting forth the terms governing the joint venture relationship between Celink and WAM.

49.     The JVA provided, in relevant part, that in addition to subservicing the CIT Loans: (i) Celink would subservice any other portfolios of mortgage servicing rights that MAM might acquire in the future (**"Future MSR Portfolios"**); (ii) Celink had a first bid right to subservice any Future MSR Portfolio; and (iii) Celink had a right to share in MAM's profits.

50.     Section 1.4(b) of the JVA provides Celink the right to submit the first bid (**"First Bid Right"**) to subservice any Future MSR Portfolios that MAM might acquire in the future, and MAM is required to accept Celink's bid unless it receives an alternative bid that does not exceed the cost of Celink's bid by more than 5%:

> In the event that [MAM acquires] any Future MSR Portfolios . . . [MAM] shall provide notice of such proposed acquisition to Celink, upon receipt of which Celink shall have a period of 5 business days to propose to [MAM] the terms on which Celink would be willing to act as sub-servicer . . . for the applicable Future MSR Portfolio. [MAM] shall have a period of 5 business days after receipt of Celink's proposal to elect to either (x) proceed with Celink's offer . . . or (y) seek an alternative offer for the subservicing of the applicable Future MSR Portfolio, in which case [MAM] shall be free to . . . enter into a sub-servicing agreement with respect thereto with another person or entity at a cost not to exceed 5% more than the subservicing fee set forth in Celink's offer.

**E.     PHH DEVISES A PLAN TO COMPETE WITH CELINK AND POACHES CELINK'S CLIENTS**

51.     In 2019, MAM submitted a bid to acquire the assets of reverse mortgage subservicer, Reverse Mortgage Solutions, LLC (**"RMS"**), in a bankruptcy action.  RMS was a competitor of Celink.  RMS's key assets included, in relevant part, a reverse mortgage servicing platform, subservicing contracts, and reverse mortgage loans.

52.     On or about October 1, 2019, MAM completed its acquisition of RMS's assets. Following the acquisition, RMS became a wholly-owned subsidiary of MAM, and MAM continued to operate RMS as a standalone reverse mortgage subservicer.

53.     Upon information and belief, in late 2019 or early 2020, PHH communicated its

interest to WAM/MAM in purchasing the RMS reverse mortgage servicing platform and associated subservicing contracts (**"RMS Platform"**), and PHH concocted an elaborate scheme to siphon the subservicing of thousands of loans away from Celink that would feed directly into the RMS Platform before PHH ultimately acquired it.  In other words, PHH was secretly preparing to enter the reverse mortgage subservicing business to compete directly with Celink.

54.     Upon information and belief, PHH conditioned its offer to purchase the RMS Platform on MAM/WAM entering into exclusive long-term subservicing contracts with PHH, covering existing and future reverse mortgage loans owned by MAM/WAM.  In other words, PHH was soliciting Celink's clients behind the scenes to subservice their loans.

55.     PHH's scheme posed several challenges:

- PHH was subject to the non-compete covenant under the PHH SSA from July 1, 2017 through July 1, 2021;
- Celink and PHH were negotiating a new subservicing agreement, wherein PHH agreed to not solicit any of Celink's existing clients (which included MAM and WAM);
- While PHH was executing its covert scheme to funnel the subservicing of thousands of MAM/WAM loans away from Celink to the RMS Platform (before ultimately purchasing the RMS Platform), PHH needed Celink to continue subservicing its loans for about 12-18 months because PHH could not service them itself;
- The improper diversion of the subservicing for thousands of loans away from Celink (via MAM and WAM) to the RMS Platform (so PHH could later acquire the RMS Platform) included loans governed by the MAM SSA and WAM SSAs;
- The MAM SSA gave Celink the exclusive right to subservice CIT Loans for at least an initial five-year term from June 1, 2018 to June 1, 2023; and
- The JVA gave Celink the First Bid Right to subservice any Future MSR Portfolios under the MAM SSA.

56.     PHH dealt with these challenges through bad faith and wrongful conduct, including but not limited to: (i) intentionally misleading and concealing its actions and plans from Celink; (ii) interfering with Celink's business relationships with MAM and WAM under their respective subservicing agreements; and (iii) inducing MAM and WAM to breach their respective subservicing agreements with Celink.

//

//

**F.**   **PHH's INTERFERENCE WITH THE MAM SSA AND WAM SSAs, AND INDUCEMENT OF BREACH**

57.   From June 12, 2020 to June 15, 2020, MAM and WAM suddenly and inexplicably served Celink with notices purportedly terminating about 14,000 CIT Loans subject to the MAM SSA (which was later increased to about 25,000 total loans, subject to both the MAM SSA/WAM SSAs) and demanded Celink transfer the subservicing for those loans to the RMS Platform (which, at that point, was wholly owned by MAM).

58.   Celink was led to believe that MAM and WAM's reasoning for issuing the purported transfer notices was because RMS was unprofitable, so by transferring the subservicing for about 25,000 MAM/WAM loans to the RMS Platform, RMS would become more profitable.  What Celink did not know at that time was that the proposed transfer was all part of PHH's elaborate scheme to acquire the RMS Platform—after improperly feeding the subservicing of about 25,000 MAM/WAM loans directly into it—to compete with Celink in the reverse mortgage subservicing business.

59.   At the time MAM and WAM issued the purported (and improper) transfer notices, upon information and belief, PHH was in the process of negotiating a long-term subservicing agreement with MAM/WAM, despite their respective subservicing contracts with Celink.  PHH knew or should have known that the subservicing of roughly 25,000 loans it improperly diverted from Celink to the RMS Platform (so that PHH could thereafter acquire the RMS Platform) was subject to existing contracts that WAM and MAM would need to terminate or breach to allow PHH to subservice those loans.

60.   Upon information and belief, PHH induced WAM and MAM to constructively terminate Celink as the subservicer for approximately 25,000 loans and forced Celink to transfer the subservicing for those loans to the RMS Platform so that PHH would become the subservicer of those loans when PHH ultimately acquired the RMS Platform.

61.   The subservicing of about 25,000 loans that Celink was wrongfully forced to transfer to the RMS Platform included loans that Celink was already subservicing for MAM and WAM under the MAM SSA and WAM SSAs, respectively.

62.     Celink initially refused to transfer any subservicing of the CIT Loans to the RMS Platform because the MAM SSA did not permit MAM to terminate Celink without cause before the end of its initial five-year term.  When MAM issued the improper termination/transfer notices, approximately three years of the initial five-year term remained under the MAM SSA whereby Celink had the exclusive right to subservice the CIT Loans (*see supra* at ¶ 45).

63.     For the loans Celink was subservicing under the WAM SSAs, Celink had no choice but to acknowledge WAM's purported termination/transfer notices because those agreements did not contain exclusivity or similar restrictions.  Nevertheless, upon information and belief, PHH still intentionally interfered with the WAM SSAs that it knew or should have known existed.

64.     Because MAM could not terminate Celink without cause under the MAM SSA, upon information and belief, PHH induced MAM to constructively terminate Celink for thousands of CIT Loans it was subservicing for MAM.  Over the next several months, MAM raised purported deficiencies in Celink's performance (at PHH's direction), threatened to sue Celink over these claimed deficiencies, withheld or delayed payments owed to Celink, and suggested that Celink should assume additional tasks not contemplated by the MAM SSA.  MAM's actions were antithetical to the parties' joint venture relationship and their many discussions about broader strategic goals.

65.     These tactics placed significant financial pressure on Celink and prevented it from conducting its business at an optimal level for an extended period of time.

66.     On May 12, 2021, Celink had no choice but to succumb to MAM and WAM's financial pressure (orchestrated by PHH), and was wrongfully forced to transfer the subservicing of roughly 25,000 MAM and WAM loans to the RMS Platform.

67.     On June 18, 2021—***barely one month later***—PHH announced it had entered into a definitive agreement to acquire the RMS Platform and entered into a five-year ***exclusive*** subservicing agreement with MAM (*see infra* at ¶ 110).

68.     By entering into an exclusive subservicing agreement with MAM, PHH intentionally interfered with Celink's Exclusivity Right under Section 2.01(l) of the MAM SSA and Celink's ability to subservice reverse mortgage loans on behalf of WAM pursuant to the WAM SSAs.

69.     But for PHH's interference, Celink reasonably believes it would have continued to subservice the WAM and MAM loans it was improperly forced to transfer to the RMS Platform.

**G.     PHH'S INTERFERENCE WITH CELINK'S FIRST BID RIGHT UNDER THE JVA, AND INDUCEMENT OF BREACH**

70.     PHH knew or should have known that Celink had a subservicing contract with MAM for the CIT Loans.  Indeed, Celink's agreement to subservice the CIT Loans was widely reported in the mortgage industry press.  Additionally, PHH had long-standing relationships with Celink's senior management and regularly communicated with Celink executives about the industry in general and Celink's business, including its client base.

71.     Nevertheless, in 2021, PHH became MAM's *exclusive* subservicer under a five-year subservicing agreement (*see infra* at ¶¶ 110).  By entering into that agreement, PHH is preventing MAM from honoring its contractual obligation to allow Celink to exercise its First Bid Right to subservice MAM's Future MSR Portfolios (*see* Section 1.4(b) of JVA, *supra* at ¶ 50).

72.     By entering into an exclusive subservicing agreement with MAM, PHH is inducing WAM's breach of Section 1.4(b) of the JVA every time MAM acquires any Future MSR Portfolio.

73.     Celink has suffered concrete injury due to PHH's interference with Celink's First Bid Right.  In December 2021, MAM acquired an MSR portfolio from Mr. Cooper Group d/b/a Champion Mortgage (**"Champion Portfolio"**).  The Champion Portfolio constitutes a Future MSR Portfolio under Section 1.4(b) of the JVA.  The Champion Portfolio consists of reverse mortgage loans/MSRs with approximately $16 billion UPB (unpaid principal balance).

74.     MAM did not allow Celink to submit a bid to subservice the Champion Portfolio.

75.     Upon information and belief, PHH is subservicing the Champion Portfolio and potentially others.

76.     But for PHH's breaches of the PHH SSA and interference with Celink's First Bid Right under the JVA, Celink would have submitted a bid for the Champion Portfolio and would have been awarded the right to subservice the Champion Portfolio.

77.     Because, upon information and belief, PHH was awarded the right to subservice the Champion Portfolio in violation of Celink's First Bid Right under the JVA, PHH has been unjustly

enriched, at Celink's expense, equal to the revenue it has earned (and will earn) from subservicing the Champion Portfolio.

### G.   PHH FRAUDULENTLY INDUCES CELINK TO AGREE TO AMENDMENT NO. 1 OF THEIR SUBSERVICING AGREEMENT

78.   In addition to PHH's devious and bad faith conduct detailed above with respect to MAM and WAM, PHH committed further wrongdoing by fraudulently inducing Celink to enter into the amendment to the PHH SSA (**"Amendment No. 1"**).

79.   In or around November 2019, Celink reached out to PHH to negotiate a new subservicing agreement because the initial three-year term of the PHH SSA was due to expire on July 1, 2020 (*see supra* at ¶ 32).

80.   Because subservicing agreements can take several months to negotiate, Celink sent PHH a draft subservicing agreement in around December 2019 to use as the basis for negotiations. PHH would not contact Celink about a new subservicing agreement for months.

81.   On April 6, 2020, Mike Kent, the President of Liberty Reverse Mortgage (PHH's reverse mortgage division), contacted Celink's then Chief Business Development Officer (**"Celink CBDO"**) to discuss the draft PHH SSA.  During this call, Mr. Kent acknowledged that he had not yet reviewed the draft that Celink had provided months earlier, but promised to do so soon.  Mr. Kent told Celink CBDO that PHH was considering servicing its own loans through an in-house reverse mortgage servicing platform it was considering developing.  Mr. Kent told Celink CBDO that PHH had retained RTG, LLC (**"RTG"**) to assist in the project.  RTG is a "Software as a Service," or "SaaS" company focused on the reverse mortgage industry.  Mr. Kent further stated that this project was in its early stages and he had no timetable or implementation plan.  Mr. Kent also claimed not to know how many loans PHH would try to service in-house, implying that it might leave some of its loans with Celink.  Mr. Kent further stated that in light of PHH's intention to service its own loans with its in-house reverse mortgage servicing platform, PHH might look for a shorter-than-usual term for the new subservicing agreement with Celink.

82.   Celink reasonably relied on Mr. Kent's representations.  In 2018, RTG had launched a cloud-hosted product called ReverseQuest that enabled lenders to service their own reverse

mortgages without the need for a subservicer.  Thus, Celink CBDO reasonably believed Mr. Kent when he said that PHH was considering implementing ReverseQuest to service its own reverse mortgage loans.

83.     By May 5, 2020, PHH still had not provided Celink with comments on the draft subservicing agreement, but Mr. Kent promised to "put high focus" on reviewing the draft agreement and provide Celink with a redline.

84.     In early-June 2020, Celink and PHH finally began discussing the terms of a new version of the PHH SSA.

85.     During a conference call held on June 9, 2020, Mike Kent informed Celink executives that PHH was building its own in-house reverse mortgage servicing platform. Consistent with what Mr. Kent and Celink CBDO discussed on April 6, 2020, Mr. Kent reiterated that PHH's in-house reverse mortgage servicing platform would be used only to service PHH's *own* reverse mortgage loans.  Mr. Kent stated that because PHH's in-house reverse mortgage servicing platform would not be ready until the fourth quarter of 2021, PHH would like Celink to continue subservicing its loans until then, but Mr. Kent noted that it might affect the term length of the PHH SSA.  Mr. Kent also stated that PHH intended to alter the non-compete provision that was in Section 8.07(a) of the then-existing PHH SSA, ostensibly because the existing covenant would have precluded PHH from servicing its own loans with its in-house platform once it became operational.

86.     Celink reasonably believed and relied upon Mr. Kent's representations that it needed more time to develop an in-house platform to service its own loans, which is why PHH needed Celink to subservice loans for PHH in the meantime.

87.     In reality, PHH never intended to service only its *own* loans.  Instead, PHH devised a plan to conceal its actions from Celink until PHH was ready to launch its own reverse mortgage servicing platform to subservice *other companies'* loans (including WAM and MAM) and compete directly with Celink, in violation of the non-compete provision in the PHH SSA which was effective through July 1, 2021 (*see supra* at ¶ 32).

88.     On June 12, 2020—after months of silence and just two weeks before the PHH SSA was due to expire—PHH finally provided Celink with comments on the draft new version of the

FIRST AMENDED COMPLAINT

PHH SSA.

89.     ***That same day***, MAM served Celink with a notice purporting to terminate about 14,000 CIT Loans subject to the MAM SSA (which was later increased to about 25,000 total loans, subject to both the MAM SSA and WAM SSAs) and demanded Celink to transfer the subservicing of those loans to the RMS Platform (*see supra* at ¶ 57).  Celink had no choice but to succumb to MAM and WAM's pressure (orchestrated by PHH), and in May 2021, Celink was forced to transfer the subservicing of about 25,000 loans to the RMS Platform (*see supra* at ¶ 66).  ***Less than one month later***, PHH announced its definitive deal to purchase the RMS Platform and entered into a five-year exclusive subservicing agreement with MAM (*see infra* at ¶ 110).

90.     This confluence of dates strongly suggests that when Mr. Kent assured Celink CBDO that PHH would only use its in-house reverse mortgage servicing platform to service its *own* loans:  (i) PHH had already devised a plan to divert WAM and MAM loans away from Celink for itself to service using its own in-house platform; and (ii) PHH and MAM/WAM had reached at least a tentative agreement and developed a general timeline for PHH to purchase the RMS Platform from MAM.

91.     On June 23, 2020, Celink CBDO and Mike Kent discussed the draft PHH SSA. Celink CBDO explained that the agreement would not be profitable to Celink unless the loans remained with Celink for a minimum period.  Mr. Kent said he understood Celink's concerns and he was agreeable to a two-year term for the draft PHH SSA.  In terms of PHH building its in-house reverse mortgage servicing platform, Mr. Kent said that after PHH's in-house platform was operational, PHH would only board new loans internally at PHH and PHH had no intention of transferring any existing loans away from Celink.

92.     At this time, PHH knew that these representations were false because, upon information and belief, PHH was already in breach of the non-compete covenant, yet proceeded to negotiate a new subservicing agreement with Celink because it needed Celink to continue servicing its loans, all while PHH was scheming to steal Celink's clients and compete directly with Celink.

93.     Given their long history, Celink reasonably believed and relied upon Mr. Kent's representations that PHH would not transfer any existing loans away from Celink.  What PHH

FIRST AMENDED COMPLAINT

failed to mention, however, is that PHH was planning to induce MAM and WAM to breach their respective subservicing agreements with Celink and divert the subservicing of about 25,000 WAM and MAM loans away from Celink to the RMS Platform, for PHH's own benefit (*see, e.g.*, *supra* at ¶¶ 51-77).

94.     Because Celink and PHH were still far from finalizing an agreement, the parties agreed to extend the term of the then-existing PHH SSA by 30 days (until August 1, 2020) to allow enough time to negotiate the new version of the PHH SSA.

95.     On July 22, 2020, Celink and PHH agreed that instead of negotiating an entirely new PHH SSA, they would prepare an amendment to the PHH SSA (Amendment No. 1) that extended the term of the PHH SSA and changed certain other provisions.

96.     On July 27, 2020, Celink provided PHH with a draft of Amendment No. 1.  To accommodate PHH's request to modify the non-compete covenant in the then-existing PHH SSA, Section 1.6(b) of Amendment No. 1 replaced the non-compete covenant with the following non-solicitation language:

> During the Term of this Agreement, neither Client nor any of its affiliates shall solicit then-existing reverse mortgage subservicing clients of Celink to provide reverse mortgage servicing or subservicing services.

97.     The term "Client" in Section 1.6(b) refers to PHH.

98.     Celink and PHH agreed to extend the then-existing PHH SSA for an additional two weeks to allow time to finish negotiating Amendment No. 1.  Thus, the new deadline for the parties to finalize Amendment No. 1 was August 14, 2020.

99.     On an August 3, 2020 conference call, Celink CBDO and Mike Kent agreed to the following essential terms for Amendment No. 1, including PHH's agreement to not solicit Celink's client to subservice those clients' reverse mortgage loans:

- •     Term: 18 months, 2 three-month extensions;
- •     Non-solicitation provision with respect to Celink's clients; and
- •     45-days' notice to terminate.

100.   That same day, Celink sent PHH a draft of Amendment No. 1 that was consistent with the essential terms agreed to by Celink CBDO and Mr. Kent, including PHH's agreement that it would not solicit Celink's clients to subservice those clients' loans.  Section 1.6(b) remained

unchanged from the prior draft (*see supra* at ¶ 96):

> During the Term of this Agreement, neither Client nor any of its affiliates shall solicit then-existing reverse mortgage subservicing clients of Celink to provide reverse mortgage servicing or subservicing services.

101.    Just two days before the August 14, 2020 deadline to finalize Amendment No. 1, PHH circulated a revised draft of Amendment No. 1 that contained numerous changes—many of which had not been discussed or agreed to by the parties.  This placed enormous pressure on the parties to continue negotiating Amendment No. 1 towards a final resolution before the August 14, 2020 deadline.

102.    On August 14, 2020, Celink and PHH executed Amendment No. 1.  The agreement was effective as of July 1, 2020.

103.    Celink subsequently discovered that Section 1.6(b) of Amendment No. 1 does not truly express Celink and PHH's mutual intent.  In particular, the text of Section 1.6(b) was changed for reasons unknown by one or both parties.  The text of Section 1.6(b) that appears in the executed version of Amendment No. 1 states, in relevant part:

> During the Term of this Agreement, neither Client nor any of its affiliates shall solicit then-existing reverse mortgage subservicing clients of Celink to provide reverse mortgage subservicing services ***with respect to the Loans***.

(Emphasis added).

104.    One party or the other may have changed Section 1.6(b) to include "with respect to the Loans."  However, the inclusion of "with respect to the Loans" was erroneous and a scrivener's error.  The words suggest some limitation that was not agreed to by the parties and would lead to an erroneous interpretation that is inconsistent with the parties' mutual intent.  Accordingly, for the reasons set forth herein (*see infra* at ¶¶ 130-145), Amendment No. 1 must be reformed to delete the text "with respect to the Loans" from Section 1.6(b) in the executed version of Amendment No. 1.

105.    At no point during the negotiations of Amendment No. 1 did the PHH disclose that it:  (i) had plans to acquire the RMS Platform; (ii) had already solicited at least two of Celink's clients (MAM and WAM) for their reverse mortgage subservicing businesses, or (iii) was planning to enter the business of subservicing reverse mortgage loans and compete directly against Celink.  PHH had exclusive knowledge of these material facts not known to Celink, and PHH actively

1    concealed these material facts from Celink during the negotiations of Amendment No. 1.

2        106.    By fraudulently inducing Celink to enter into Amendment No. 1, PHH would reap

3    the benefits of Celink subservicing the loans PHH could not service itself for the next 12-18

4    months.  Meanwhile, despite the non-solicitation provision in Amendment No. 1 that Celink and

5    PHH were negotiating and agreed to, upon information and belief, PHH was already soliciting

6    MAM and WAM for their subservicing business.

7        107.    Upon information and belief, while Celink and PHH were negotiating Amendment

8    No. 1, PHH was also inducing MAM and WAM to breach their respective subservicing agreements

9    with Celink so that PHH could ultimately acquire the RMS Platform (which, upon information and

10   belief, included in part the subservicing of about 25,000 MAM and WAM loans wrongfully

11   diverted from Celink to the RMS Platform) for PHH's own benefit.

12       108.    Despite Mr. Kent's representations, PHH never intended to limit the use of its in-

13   house reverse mortgage servicing platform it was developing to service its *own* loans.  Just the

14   opposite.  PHH it fully intended to compete directly against Celink in the reverse mortgage

15   subservicing industry, despite the non-compete provision that was effective through July 1, 2021.

16   PHH's strategy for entering the reverse mortgage subservicing market (*i.e.*, servicing for other

17   companies) consisted of (i) poaching Celink's existing clients, including MAM and WAM,

18   precisely what PHH had agreed ***not*** to do when the parties executed Amendment No. 1; and (ii)

19   improperly siphoning the subservicing for about 25,000 MAM/WAM loans away from Celink to

20   the RMS Platform so that PHH could subservice those loans.

21       109.    PHH's material misrepresentations and omissions induced Celink to enter into

22   Amendment No. 1 and continue subservicing PHH's reverse mortgage loans while, behind Celink's

23   back, PHH was secretly gearing up to compete head-to-head against Celink.  But for these material

24   misrepresentations and omissions, Celink would not have agreed to enter into Amendment No. 1

25   and would not have continued to subservice reverse mortgage loans on behalf of PHH.  PHH

26   concealed its true intentions of not being bound by the terms of Amendment No. 1 to the detriment

27   of Celink.

28   //

**H.    PHH ACQUIRES THE RMS PLATFORM AND BECOMES MAM'S EXCLUSIVE SUBSERVICER**

110.    Celink did not learn of PHH's machinations until June 18, 2021, when PHH announced it had entered into a definitive agreement to acquire the RMS Platform and entered into a five-year exclusive subservicing agreement with MAM—***barely one month after*** the subservicing of nearly 25,000 WAM/MAM loans was improperly funneled into the RMS Platform as part of PHH's elaborate scheme to subservice those loans itself (*see supra* at ¶¶ 66-67).

111.    By doing so, PHH violated Section 8.07(b) of the PHH SSA (non-compete covenant), which was effective through July 1, 2021.

112.    Subservicing agreements typically take months—sometimes close to a year—to negotiate.  The fact that PHH made this announcement a month after the subservicing for nearly 25,000 WAM/MAM loans were improperly diverted to the RMS Platform strongly suggests that PHH's solicitation of WAM/MAM's business was well underway by the time Celink and PHH were negotiating Amendment No. 1, which explicitly included a non-solicitation covenant.

113.    PHH's pursuit and solicitation of business from MAM and WAM continued after July 1, 2020, and into 2021, which violated the non-solicitation covenant in Section 1.6(b) of Amendment No. 1.

114.    PHH's purchase of the RMS Platform closed on or about October 1, 2021.

115.    Notably, Ocwen's (PHH's parent) 2022 SEC Form 10-K disclosed that:

- PHH "acquired reverse mortgage subservicing contracts from MAM (RMS) and became its exclusive subservicer under a five-year subservicing agreement."
- PHH "became the subservicer for approximately 57,000 reverse mortgages, or approximately $14.3 billion in UPB pursuant to subservicing agreements with various clients, including MAM (RMS) (five-year term)."
- Under "the five-year subservicing agreement with MAM (RMS), [PHH] expect[s] to add subservicing approximately 60,000 reverse mortgage loans or approximately $13.1 billion in UPB upon boarding to our servicing platform in the first half of 2022 . . . ."
- PHH collected "$9.2 million in subservicing fees related to the MAM (RMS) reverse subservicing portfolio acquired" by PHH.

116.    Upon information and belief, PHH acquired the RMS Platform—which, upon information and belief, partially comprised the subservicing of nearly 25,000 MAM/WAM loans

FIRST AMENDED COMPLAINT

that were improperly funneled into the RMS Platform—due to its bad faith conduct, including but not limited to, breaches of the PHH SSA, tortious interference with Celink's contracts and business relationships, and inducement of breach of Celink's subservicing agreements with MAM and WAM.

## I.   DAMAGES CAUSED BY PHH'S WRONGFUL ACTS

117.   Celink has suffered substantial injury and damages as the direct and proximate result of PHH's wrongful acts.  Celink's damages include, but are not limited to:

- at least $6.9 million in lost revenue that Celink would have earned from subservicing the MAM and WAM loans that were improperly diverted to the RMS Platform;
- the loss of revenue, in an amount to be determined at trial, that Celink reasonably expected to earn from subservicing Future MSR Portfolios under the JVA, including the Champion Portfolio and potentially others;
- punitive damages due to PHH's wrongful conduct alleged herein;
- disgorgement of PHH's profits obtained due to PHH's wrongful conduct alleged herein;
- the revenue from which PHH has been unjustly enriched;
- diminution of Celink's franchise value; and
- costs of suit, expenses, and attorney's fees incurred herein.

## CLAIMS FOR RELIEF

## COUNT I
## BREACH OF CONTRACT
## (NON-COMPETE)

118.   Celink incorporates by reference each and every allegation contained in Paragraphs 1 through 117, as if fully set forth herein.

119.   Celink and PHH are parties to the PHH SSA, as amended by Amendment No. 1.

120.   The PHH SSA is a valid and enforceable contract.

121.   Celink fully performed its duties under the PHH SSA.

122.   Section 8.07(b) of the PHH SSA contained a non-compete covenant that prohibited PHH from engaging in the business of subservicing reverse mortgage loans during the term of the agreement, plus one year following the term.  Section 8.07(b) provided, in relevant part:

Because of Celink's legitimate business interest as described herein and the good and valuable consideration offered to [OLS/Liberty], the receipt and sufficiency of which is acknowledged, during the Term ***and for one year following such Term***,

[OLS/Liberty] agrees and covenants not to engage in Prohibited Activity within the United States, including its territories and possessions. For purposes of this non-compete clause, "**Prohibited Activity**" is the business of subservicing HECM loans. Prohibited Activity also includes activity that may require or inevitably require disclosure of Celink's Information (as defined in Article VIII) or its Intellectual Property Rights. Nothing herein shall prohibit [OLS/Liberty] from purchasing or owning less than five percent (5%) of the publicly traded securities of any corporation that engages in the subservicing of HECM loans, provided that such ownership represents a passive investment and that [OLS/Liberty] is not a controlling person of, or a member of a group that controls, such corporation.

(Emphasis added).

123.    Thus, although the initial three-year term of the PHH SSA would expire on July 1, 2020, PHH was bound by the non-compete covenant in Section 8.07(a) from July 1, 2017 until July 1, 2021.

124.    PHH violated the non-compete covenant by engaging in "Prohibited Activities" prior to July 1, 2021, including but not limited to:

- negotiating the purchase and/or purchasing the RMS Platform;
- contracting with MAM and/or WAM to provide them with reverse mortgage subservicing services;
- inducing WAM and MAM to issue improper termination/transfer notices demanding Celink to transfer the subservicing for about 25,000 loans to the RMS Platform shortly before PHH announced its purchase of the RMS Platform; and
- taking affirmative steps develop a competing subservicing business with Celink.

125.    As a direct and proximate result of its breach of the non-compete covenant in Section 8.07(b), PHH has become one of Celink's direct competitors.

126.    As a direct and proximate result of its breach of the non-compete covenant, PHH became the subservicer for approximately 57,000 reverse mortgages with approximately $14.3 billion in UPB in 2021, and approximately 60,000 reverse mortgage loans with approximately $13.1 billion in UPB during the first half of 2022.  Celink has suffered and will continue to suffer general and special damages in an amount to be proven at trial.

127.    As the direct and proximate result of its breach of the non-compete covenant, PHH has diverted significant subservicing revenue away from Celink to itself, including:

- at least $6.9 million in lost revenue that Celink would have earned from subservicing the MAM and WAM loans that were improperly diverted to

the RMS Platform;

- the loss of revenue, in an amount to be determined at trial, that Celink reasonably expected to earn from subservicing Future MSR Portfolios under the JVA, including the Champion Portfolio and potentially others.

128.   Additionally, Celink is also entitled to disgorgement of the profits PHH wrongfully obtained that it otherwise would not have earned but for its breach of the non-compete covenant.

129.   Celink is entitled to an award of compensatory damages, in an amount to be determined at trial, as well as costs, expenses, and attorney's fees incurred herein, plus other relief as the court deems just and proper.

**COUNT II**
**REFORMATION OF CONTRACT**
**(AMENDMENT NO. 1)**

130.   Celink incorporates by reference each and every allegation contained in Paragraphs 1 through 129, as if fully set forth herein.

131.   On July 27, 2020, Celink provided PHH with a draft of Amendment No. 1.  To accommodate PHH's request to modify the non-compete covenant, Section 1.6(b) of Amendment No. 1 replaced the non-compete covenant with a non-solicitation covenant, which provided, in relevant part:

During the Term of this Agreement, neither Client nor any of its affiliates shall solicit then-existing reverse mortgage subservicing clients of Celink to provide reverse mortgage servicing or subservicing services.

132.   The capitalized term "Client" in Section 1.6(b) refers to PHH.

133.   On August 3, 2020, Celink and PHH agreed to the following essential terms for Amendment No. 1, including PHH's agreement to not solicit Celink's clients to subservice those clients' reverse mortgage loans:

- Term: 18 months, 2 three-month extensions
- Non-solicitation provision with respect to Celink's clients
- 45-days' notice to terminate

134.   That same day, Celink sent PHH a draft of Amendment No. 1 that was consistent with the essential terms agreed to by the parties, including PHH's agreement to not solicit Celink's clients to subservice those clients' reverse mortgage loans.  Section 1.6(b) remained unchanged from the prior draft.

135.     Just two days before the August 14, 2020 deadline to finalize Amendment No. 1, PHH circulated a revised draft Amendment No. 1 containing numerous changes—many of which had not been discussed or agreed to by the parties.  This placed enormous pressure on the parties to continue negotiating Amendment No. 1 towards a final resolution before the August 14, 2020 deadline.

136.     On August 14, 2020, Celink and PHH executed Amendment No. 1.  The agreement was effective as of July 1, 2020.

137.     Celink subsequently discovered that Amendment No. 1 does not truly express the parties' mutual intention with respect to Section 1.6(b).

138.     In particular, the first sentence of Section 1.6(b) was changed for reasons unknown by one or both parties.  The text of Section 1.6(b) that appears in the executed version of Amendment No. 1 states, in relevant part:

> During the Term of this Agreement, neither Client nor any of its affiliates shall solicit then-existing reverse mortgage subservicing clients of Celink to provide reverse mortgage subservicing services ***with respect to the Loans***.

(Emphasis added).

139.     One party or the other may have changed Section 1.6(b) to include "with respect to the Loans."  However, the inclusion of "with respect to the Loans" was erroneous and a scrivener's error, and it suggests some limitation that is inconsistent with the parties' mutual intention regarding Section 1.6(b).

140.     "Loans" is defined in Amendment No. 1 as "a HECM Loan or a Non-HECM Loan subserviced by Celink pursuant to this Agreement."  The "Agreement" is the PHH SSA which governs PHH's own reverse mortgage loans subserviced by Celink.  Read literally (Celink disputes this interpretation), Section 1.6(b), as currently written, could be interpreted to prohibit PHH from soliciting Celink's clients to subservice *PHH's own* reverse mortgage loans.  However, that would lead to an erroneous interpretation that is contrary to the mutual intention of the parties and would defeat the entire purpose of entering into a non-solicitation covenant.

141.     The parties' mutual intention regarding Section 1.6(b) is clear:  PHH shall not solicit Celink's clients to allow PHH to subservice those *clients'* reverse mortgage loans.  In other words,

PHH cannot offer to subservice loans for Celink's clients who are already using Celink to subservice their loans.  This mutual intention is reflected by the parties' negotiations regarding the essential terms of Amendment No. 1 (*see, e.g.*, *supra* at ¶¶ 96, 99, 100, 102).

142.    Celink's clients are mortgage servicers, not *sub*servicers.  Celink's clients contract with Celink (a *sub*servicer) to service loans for them because they lack the infrastructure to service their own loans, let alone anyone else's.  Thus, it is nonsensical to interpret Section 1.6(b), as currently written, to prohibit PHH from asking companies—that *do not* and *cannot* subservice loans—to subservice *PHH's loans*.

143.    Accordingly, reformation of Section 1.6(b) in the executed version of Amendment No. 1 is necessary and appropriate.

144.    As a result of the aforementioned unilateral or mutual mistake, the written agreement must be revised to delete the text "with respect to the Loans" so that it accurately expresses the parties' mutual intention with respect to Section 1.6(b) at the time they entered into Amendment No. 1—namely, to prohibit PHH from soliciting Celink's clients to subservice those clients' reverse mortgage loans.

145.    Therefore, Celink seeks an order from the Court reforming the first sentence of Section 1.6(b) of Amendment No. 1, executed on August 14, 2020, to state:

> During the Term of this Agreement, neither Client nor any of its affiliates shall solicit then-existing reverse mortgage subservicing clients of Celink to provide reverse mortgage subservicing services.

**COUNT III**
**BREACH OF CONTRACT**
**(NON-SOLICITATION)**

146.     Celink incorporates by reference each and every allegation contained in Paragraphs 1 through 145, as if fully set forth herein.

147.    Celink and PHH are parties to Amendment No. 1 to the PHH SSA.

148.    Amendment No. 1 is a valid and enforceable contract, which became effective as of July 1, 2020.

149.    Celink fully performed its obligations under Amendment No. 1.

FIRST AMENDED COMPLAINT

150. Section 1.6(b) of Amendment No. 1, as reformed (*see supra* at ¶ 145), prohibited PHH from soliciting Celink's then-existing clients to subservice those clients' loans during the term of Amendment No. 1. The term of Amendment No. 1 was July 1, 2020 through December 30, 2021.

151. PHH solicited MAM and WAM after July 1, 2020 and into 2021. PHH breached the non-solicitation covenant in Section 1.6(b) of Amendment No. 1, as reformed, by:

- soliciting and contracting with WAM and MAM to provide them with reverse mortgage subservicing services;
- soliciting and inducing WAM and MAM to constructively terminate Celink as subservicer for about 25,000 loans subject to the MAM SSA and WAM SSAs; and
- taking affirmative steps to acquire the right to subservice the loans subject to the MAM SSA and WAM SSAs, such as proposing and negotiating the terms of an exclusive five-year subservicing agreement with MAM.

152. Upon information and belief, PHH solicited other Celink clients after July 1, 2020, for their subservicing business.

153. Upon information and belief, PHH knew that MAM and WAM were Celink's clients.

154. Upon information and belief, PHH knew that Celink was subservicing the CIT Loans and WAM loans it was targeting under subservicing contracts Celink had with MAM and WAM, respectively. Upon information and belief, PHH knew Celink had the exclusive right to subservice the CIT Loans.

155. As a direct and proximate result of PHH's breach of the non-solicitation covenant, it has diverted significant subservicing revenue away from Celink to itself, including:

- at least $6.9 million in lost revenue that Celink would have earned from subservicing the MAM and WAM loans that were improperly diverted to the RMS Platform; and
- the loss of revenue, in an amount to be determined at trial, that Celink reasonably expected to earn from subservicing Future MSR Portfolios under the JVA, including the Champion Portfolio and potentially others.

156. Celink is entitled to an award of compensatory damages, in an amount to be determined at trial, as well as costs, expenses, and attorney's fees incurred herein, plus other relief as the Court deems just and proper.

## COUNT IV
### BREACH OF THE IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING

157.   Celink incorporates by reference each and every allegation contained in Paragraphs 1 through 156, as if fully set forth herein.

158.   Celink and PHH are parties to the PHH SSA, as amended by Amendment No. 1.

159.   The PHH SSA is a valid and enforceable contract.

160.   Celink fully performed its duties under the PHH SSA.

161.   The duty of good faith is implied in all contracts and requires faithfulness to an agreed common purpose and conduct consistent with the parties' reasonable expectations.  The implied duty of good faith and fair dealing prohibits a party from engaging in actions that deprive the other of the benefit of the bargain.

162.   PHH was bound by an implied covenant of good faith and fair dealing to refrain from competing against Celink during the term of the PHH SSA.  PHH breached this duty because it secretly prepared to compete directly against Celink and employed a scheme to solicit Celink's clients while Celink provided PHH with subservicing services.

163.   PHH was bound by an implied covenant of good faith and fair dealing to negotiate Amendment No. 1 in good faith, which required PHH to disclose any and all information that Celink would reasonably find material to its decision to enter into the amendment and the parties' negotiations.  PHH breached this implied duty by concealing, during negotiation of Amendment No. 1:  (i) its true intentions to enter the reverse mortgage subservicing business and compete head-to-head with Celink and (ii) that it was in the process of and/or planning to solicit Celink's clients to subservice their loans.

164.   PHH was bound by an implied covenant of good faith and fair dealing not to interfere with Celink's contracts and business expectancies.  PHH breached this implied duty through improper conduct, including but not limited to: (i) devising and executing a covert scheme to solicit Celink's clients and compete directly with Celink; (ii) orchestrating the improper diversion of the subservicing for thousands of loans away from Celink to the RMS Platform for the ultimate benefit of PHH; and (iii) secretly negotiating a long-term subservicing agreement with

WAM/MAM that intentionally interferes with Celink's First Bid Right under the JVA and Exclusivity Right under the MAM SSA.

165.   As a direct and proximate result of PHH's breaches of the implied covenant of good faith and fair dealing, it has diverted significant subservicing revenue away from Celink to itself, including:

- at least $6.9 million in lost revenue that Celink would have earned from subservicing the MAM and WAM loans that were improperly diverted to the RMS Platform; and
- the loss of revenue, in an amount to be determined at trial, that Celink reasonably expected to earn from subservicing Future MSR Portfolios under the JVA, including the Champion Portfolio and potentially others.

166.   Celink is entitled to an award of compensatory damages, in an amount to be determined at trial, as well as costs, expenses, and attorney's fees incurred herein, plus other relief as the Court deems just and proper.

**COUNT V**
**FRAUDULENT INDUCEMENT**
**(AMENDMENT NO. 1)**

167.   Celink incorporates by reference each and every allegation contained in Paragraphs 1 through 166, as if fully set forth herein.

168.   In or around November 2019, Celink reached out to PHH to discuss negotiating a new subservicing agreement because the initial three-year term of the PHH SSA was due to expire on July 1, 2020.  PHH would not contact Celink about a new agreement for months.

169.   On April 6, 2020, Mike Kent, the President of Liberty Reverse Mortgage (PHH's reverse mortgage division), told Celink's Chief Business Development Officer ("Celink CBDO") that PHH was considering servicing its *own* reverse mortgage loans through an in-house reverse mortgage servicing platform it was developing.  Mr. Kent told Celink CBDO that PHH had retained RTG, LLC ("RTG") to assist in the project.  Mr. Kent further stated that in light of PHH's intention to service its *own* loans with its in-house platform, PHH may look for a shorter-than-usual term for the new subservicing agreement it was negotiating with Celink.

170.   On June 23, 2020, Mr. Kent told Celink CBDO that after PHH's in-house reverse mortgage servicing platform was operational, PHH would only board new loans internally at PHH

and PHH had no intention of transferring any existing loans away from Celink.  Mr. Kent reiterated that PHH would only use its in-house reverse mortgage servicing platform to service its *own* loans. In other words, PHH agreed it would not compete with Celink because it would be servicing its own loans, not subservicing loans on behalf of other companies.

171.    At this time, PHH was still bound by the non-compete covenant of the PHH SSA (which was not due to expire until July 1, 2021, *see supra* at ¶ 32).  PHH knew that these representations to Celink were false when made because, upon information and belief, PHH was *already* in breach of the non-compete covenant.  Yet, PHH proceeded to negotiate a new subservicing agreement with Celink because it needed Celink to continue servicing its loans, all while PHH was scheming to steal Celink's clients and compete directly with Celink.

172.    PHH agreed to be bound by the terms of Amendment No. 1 when it executed the agreement with Celink on August 14, 2020.  However, PHH never intended to honor its promise to do so because at that time, upon information and belief, PHH was *already* soliciting MAM and WAM for their subservicing business.

173.    Despite Mr. Kent's representations to Celink CBDO, PHH never intended to limit the use of its in-house reverse mortgage servicing platform it was developing to servicing its *own* loans.  Just the opposite.  PHH fully intended to compete directly against Celink in the reverse mortgage subservicing industry by soliciting WAM and MAM for their subservicing business and diverting the subservicing for thousands of loans away from Celink so PHH could subservice those loans itself.

174.    PHH, through Mr. Kent, deliberately made a false representation that it intended to be bound by the non-solicitation provision of Amendment No. 1 and that it intended to use its in-house servicing platform to service its *own* loans rather than loans owned by other companies. PHH, through Mr. Kent, made these false representations to induce Celink to enter into Amendment No. 1.

175.    PHH knew these statements were false at the time they were made because upon information and belief, PHH was already soliciting MAM and WAM for their business and was developing and/or executing a plan to improperly divert the subservicing for nearly 25,000

WAM/MAM loans away from Celink to the RMS Platform (which PHH would ultimately acquire).

176.    Mr. Kent told Celink CBDO that PHH needed Celink to continue subservicing its loans until PHH completed developing its in-house reverse mortgage servicing platform.  Mr. Kent made these false representations to Celink so that PHH could reap the benefits of Celink subservicing PHH's loans, which would give PHH enough time to solicit MAM and WAM's business and for PHH to directly compete with Celink by inducing MAM and WAM to divert the subservicing for nearly 25,000 loans to the RMS Platform for the ultimate benefit of PHH.

177.    At no point during the negotiations of Amendment No. 1 did PHH disclose that it: (i) had plans to acquire the RMS Platform; (ii) had already solicited at least two of Celink's clients (MAM and WAM) for their reverse mortgage subservicing businesses, or (iii) was planning to enter the business of subservicing reverse mortgage loans and compete directly against Celink.  PHH had exclusive knowledge of these material facts not known to Celink, and PHH actively concealed these material facts from Celink during the negotiations of Amendment No. 1.

178.    Celink justifiably relied on and was induced by PHH's false representations.  The company that PHH had engaged to assist in developing PHH's in-house reverse mortgage servicing platform had issued a product that would allow lenders to service their own loans without building a full-scale servicing platform.  Moreover, PHH's predecessor, Liberty, had been Celink's client since 2012, and Celink had a long-standing relationship with Liberty/PHH management.  Furthermore, at PHH's insistence (through Mr. Kent), Celink CBDO and Mr. Kent agreed to include a non-solicitation covenant in Amendment No. 1.

179.    PHH's false representations, through Mr. Kent, occurred during the negotiation of the terms of Amendment No. 1 and demonstrate PHH's intent not to be bound by Amendment No. 1 at the time the parties entered into that agreement.

180.    Had Celink known PHH intended to use its in-house reverse mortgage servicing platform to subservice *other companies'* loans, rather than its *own* loans, Celink would not have agreed to enter into Amendment No. 1 and would not have continued to subservice reverse mortgage loans on behalf of PHH.  PHH concealed its true intentions of not being bound by the terms of Amendment No. 1 to the detriment of Celink, while PHH surreptitiously plundered

Celink's clients and revenue base.

181.    PHH's conduct was intentional, willful, wanton, and/or committed with reckless disregard of Celink's contractual and common law rights and protected interests.  As a result of PHH's fraudulent misrepresentations, Celink is entitled to an award of punitive damages along with compensatory damages, in an amount to be determined at trial.

182.    Alternatively, as a direct and proximate result of PHH fraudulently inducing Celink to enter into Amendment No. 1 (*see supra* at ¶¶ 167-181), Celink is entitled to rescission of Amendment No. 1.  Thus, Celink seeks an order from the Court that Amendment No.1 has been rescinded and for any other relief the Court deems just and proper.

**COUNT VI**
**INDUCEMENT OF BREACH OF CONTRACT**

183.    Celink incorporates by reference each and every allegation contained in Paragraphs 1 through 182, as if fully set forth herein.

184.    Celink and MAM are parties to the MAM SSA.

185.    The MAM SSA is a valid and enforceable contract.

186.    Section 2.01(l) of the MAM SSA gives Celink the exclusive right to subservice all CIT Loans during the Term of the MAM SSA. The Initial Term of the MAM SSA is five years.

187.    Celink and WAM are parties to the JVA.

188.    The JVA is a valid and enforceable contract.

189.    Section 1.4(b) of the JVA granted Celink a First Bid Right with respect to Future MSR Portfolios.

190.    Celink fully performed its duties under the MAM SSA and the JVA.

191.    PHH knew that Celink subserviced the CIT Loans pursuant to the subservicing agreement or contractual arrangement with MAM and WAM.

192.    PHH took affirmative steps to induce MAM to breach the MAM SSA and WAM to breach the JVA, including but not limited to:

- soliciting and pursuing MAM and WAM for their subservicing business;
- negotiating an exclusive long-term subservicing agreement with MAM that required MAM to terminate Celink as subservicer for CIT Loans;

- entering into an exclusive, five-year subservicing agreement with MAM to subservice the CIT Loans, which PHH knew CIT had the exclusive right to subservice;

- inducing MAM and WAM to constructively terminate Celink as subservicer of about 25,000 loans and improperly transfer the subservicing of those loans to the RMS Platform; and

- conditioning or tying PHH's purchase of the RMS Platform on MAM/WAM agreeing to enter into an exclusive long-term subservicing agreement with PHH that included Future MSR Portfolios under the JVA.

193.   PHH knowingly and intentionally induced MAM to breach the MAM SSA.

194.   PHH knowingly and intentionally induced WAM to breach the JVA.

195.   MAM breached the MAM SSA by actually and/or constructively terminating Celink as subservicer of CIT Loans, which Celink had the exclusive right to subservice during the term of the MAM SSA (from June 1, 2018 to June 1, 2023).

196.   WAM breached the JVA by entering into and/or allowing MAM to enter into an exclusive five-year subservicing agreement with PHH that gave PHH the right to subservice loans that constitute Future MSR Portfolios under the JVA, as to which Celink has the First Bid Right.

197.   WAM further breached the JVA when, upon information and belief, it engaged PHH to subservice the Champion Portfolio, which constitutes a Future MSR Portfolio under the JVA, without allowing Celink to exercise its First Bid Right under Section 1.4 of the JVA.

198.   As the result of PHH's inducement of MAM's breach of the MAM SSA and WAMs breach of the JVA, Celink has suffered substantial injury, including:

- at least $6.9 million in lost revenue that Celink would have earned from subservicing the MAM and WAM loans that were improperly diverted to the RMS Platform; and

- the loss of revenue, in an amount to be determined at trial, that Celink reasonably expected to earn from subservicing Future MSR Portfolios under the JVA, including the Champion Portfolio and potentially others.

199.   Celink is entitled to an award of compensatory damages, in an amount to be determined at trial, as well as costs, expenses, and attorney's fees incurred herein, plus other relief as the Court deems just and proper.

200.   Additionally, because PHH's conduct was intentional, willful, wanton, and/or

1  committed with reckless disregard for Celink's contractual and common law rights and protected

2  interests, Celink is also entitled to an award of punitive damages.

3
### COUNT VII
4
**TORTIOUS INTERFERENCE WITH CONTRACT**

5      201.    Celink incorporates by reference each and every allegation contained in Paragraphs 1

6  through 200, as if fully set forth herein.

7      202.    Celink and MAM are parties to the MAM SSA.

8      203.    The MAM SSA is a valid and enforceable contract.

9      204.    Section 2.01(1) of the MAM SSA gives Celink the exclusive right to subservice all

10  CIT Loans during the initial five-year term of the MAM SSA (June 1, 2018 to June 1, 2023).

11     205.    Celink and WAM (and its affiliated entities) are parties to the WAM SSAs.

12     206.    The WAM SSAs are valid and enforceable contracts pursuant to which Celink

13  subserviced reverse mortgage loans on behalf of WAM and its affiliates.

14     207.    Celink and WAM are parties to the JVA.

15     208.    The JVA is a valid and enforceable contract.

16     209.    Section 1.4(b) of the JVA granted Celink a First Bid Right with respect to Future

17  MSR Portfolios.

18     210.    Celink fully performed its duties under the MAM SSA, the WAM SSAs, and the

19  JVA.

20     211.    Upon information and belief, PHH knew that Celink subserviced reverse mortgage

21  loans on behalf of MAM and WAM pursuant to the MAM SSA and WAM SSAs.

22     212.    PHH intentionally interfered with Celink's contractual rights and reasonable

23  expectations under the MAM SSA and WAM SSAs by:

24     •      soliciting and pursuing WAM and MAM for their subservicing business;
       •      negotiating an exclusive long-term subservicing agreement with
25             MAM/WAM that required MAM/WAM to terminate Celink as
               subservicer for all or some of their loans;
26     •      conditioning PHH's purchase of the RMS Platform on MAM/WAM
               entering into an exclusive, long-term subservicing agreement with PHH;
27     •      inducing MAM and WAM to actually and/or constructively terminate
               Celink as subservicer for about 25,000 loans Celink was already
28             subservicing for them; and

- knowingly and intentionally entering into an exclusive, five-year subservicing agreement with MAM to subservice the CIT Loans, which Celink had the exclusive right to subservice under the MAM SSA.

213.    PHH intentionally interfered with Celink's contractual rights and reasonable expectations under the JVA (specifically, Celink's First Bid Right under Section 1.4(b) of the JVA) by entering into an exclusive, five-year agreement with MAM to subservice reverse mortgage loans that MAM acquires which constitute Future MSR Portfolios under the JVA, without regard to Celink's First Bid Right.

214.    PHH intentionally interfered with Celink's First Bid Right under the JVA when, upon information and belief, it agreed to subservice the Champion Portfolio, which constitutes a Future MSR Portfolio under the JVA, knowing that Celink had a First Bid Right with respect to the Champion Portfolio and further knowing that MAM did not offer Celink an opportunity to bid on the right to subservice the Champion Portfolio.

215.    As the direct and proximate result of PHH's tortious interference with the MAM SSA, the WAM SSAs, and the JVA, Celink has suffered significant damages, including, but not limited to:

- at least $6.9 million in lost revenue that Celink would have earned from subservicing the MAM and WAM loans that were improperly diverted to the RMS Platform; and
- the loss of revenue, in an amount to be determined at trial, that Celink reasonably expected to earn from subservicing Future MSR Portfolios under the JVA, including the Champion Portfolio and potentially others.

216.    Celink is entitled to an award of compensatory damages, in an amount to be determined at trial, as well as costs, expenses, and attorney's fees incurred herein, plus other relief as the Court deems just and proper.

217.    Additionally, because PHH's conduct was intentional, willful, wanton, and/or committed with reckless disregard for Celink's contractual and common law rights and protected interests, Celink is also entitled to an award of punitive damages.

## COUNT VIII
## NEGLIGENT INTERFERENCE WITH CONTRACT

218.    Celink incorporates by reference each and every allegation contained in Paragraphs 1 through 217, as if fully set forth herein.

219.   Celink and MAM are parties to the MAM SSA.

220.   The MAM SSA is a valid and enforceable contract.

221.    Section 2.01(1) of the MAM SSA gives Celink the exclusive right to subservice all CIT Loans during the initial five-year term of the MAM SSA (June 1, 2018 to June 1, 2023).

222.   Celink and WAM (and its affiliated entities) are parties to the WAM SSAs.

223.   The WAM SSAs are valid and enforceable contracts pursuant to which Celink subserviced reverse mortgage loans on behalf of WAM and its affiliates.

224.   Celink and WAM are parties to the JVA.

225.   The JVA is a valid and enforceable contract.

226.   Section 1.4(b) of the JVA granted Celink a First Bid Right with respect to Future MSR Portfolios.

227.   Celink fully performed its duties under the MAM SSA, the WAM SSAs, and the JVA.

228.   Celink reasonably expected that it would continue to provide subservicing services to WAM and MAM for the foreseeable future or at least until the terms for their respective agreements ended.

229.   During all relevant times, PHH had a duty to Celink to exercise reasonable care to not interfere with Celink's business relationships and subservicing contracts with WAM and MAM.

230.   PHH negligently interfered with Celink's rights and expectations under the MAM SSA, the WAM SSAs, and the JVA.

231.   Upon information and belief, PHH knew that Celink subserviced reverse mortgage loans on behalf of MAM and WAM pursuant to the MAM SSA, WAM SSAs, and JVA.

232.   PHH breached its duty and negligently interfered with Celink's contractual rights and reasonable expectations under the MAM SSA and WAM SSAs by:

- soliciting and pursuing WAM and MAM for their subservicing business;
- negotiating an exclusive long-term subservicing agreement with MAM/WAM that required MAM/WAM to terminate Celink as subservicer for all or some of their loans;
- conditioning PHH's purchase of the RMS Platform on MAM/WAM entering into an exclusive, long-term subservicing agreement with PHH;

- • inducing MAM and WAM to actually and/or constructively terminate Celink as subservicer for about 25,000 loans Celink was already subservicing for them; and
- • entering into an exclusive, five-year subservicing agreement with MAM to subservice the CIT Loans, which Celink had the exclusive right to subservice under the MAM SSA.

233.    PHH breached its duty and negligently interfered with Celink's contractual rights and reasonable expectations under the JVA (specifically, Celink's First Bid Right under Section 1.4(b) of the JVA) by entering into an exclusive, five-year agreement with MAM to subservice reverse mortgage loans that MAM acquires, which constitutes a Future MSR Portfolio under the JVA, without regard to Celink's First Bid Right.

234.    PHH further breached its duty and negligently interfered with Celink's First Bid Right when, upon information and belief, it agreed to subservice the Champion Portfolio, which constitutes a Future MSR Portfolio under the JVA, knowing that Celink had a First Bid Right with respect to the Champion Portfolio and further knowing that MAM did not offer Celink an opportunity to bid on the right to subservice the Champion Portfolio.

235.    As the direct and proximate result of PHH's negligent interference with the MAM SSA, the WAM SSAs, and the JVA, Celink has suffered significant damages, including, but not limited to:

- • at least $6.9 million in lost revenue that Celink would have earned from subservicing the MAM and WAM loans that were improperly diverted to the RMS Platform; and
- • the loss of revenue, in an amount to be determined at trial, that Celink reasonably expected to earn from subservicing Future MSR Portfolios under the JVA, including the Champion Portfolio and potentially others.

236.    Celink is entitled to an award of compensatory damages, in an amount to be determined at trial, as well as costs, expenses, and attorney's fees incurred herein, plus other relief as the Court deems just and proper.

237.    Additionally, because PHH's conduct was committed with reckless disregard for Celink's contractual and common law rights and protected interests, Celink is also entitled to an award of punitive damages.

//

## COUNT IX
### INDEMNIFICATION

238.    Celink incorporates by reference each and every allegation contained in Paragraphs 1 through 237, as if fully set forth herein.

239.    Section 9.03 of the PHH SSA requires PHH to indemnify, hold harmless, and reimburse Celink for:

> any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements, including reasonable fees and expenses of counsel of litigation, which are imposed on, incurred by or asserted against Celink, to the extent that any of the same results from (i) any material breach of any representation or warranty without regard to any related knowledge, materiality or other qualifier made by [PHH] under this Agreement or any schedule, written statement, document or certificate furnished by [PHH] pursuant to this Agreement, (ii) any material breach by [PHH] of any covenant or obligation of [PHH] under this Agreement or any schedule, written statement, document or certificate furnished by [PHH] pursuant to this Agreement, or (iii) the gross negligence, willful misfeasance or bad faith of [PHH] in the performance of its duties under this Agreement.

240.    The indemnities contained in Section 9.03 survive termination of PHH SSA.

241.    PHH's conduct alleged herein constitutes a "material breach" of its covenants and obligations under the PHH SSA, including its obligations under Section 8.07 of the PHH SSA and Section 1.06(b) of Amendment No. 1.

242.    PHH's conduct alleged herein also amounts to willful malfeasance or bad faith in the performance of its duties under the PHH SSA.

243.    As a direct and proximate result of PHH's breaches of the PHH SSA, willful malfeasance, and bad faith, Celink has suffered substantial losses and damages, plus additional costs, expenses, and disbursements, including reasonable fees and expenses of counsel of litigation.

244.    Pursuant to Section 9.03, PHH must indemnify Celink for all losses and damages it has suffered, as alleged herein, plus additional costs, expenses, and disbursements, including its reasonable fees and expenses counsel in bringing and maintaining this lawsuit.

245.    From about October-November 2021, Celink made multiple demands upon PHH to indemnify Celink for injuries it sustained due to its breach of Section 8.07 of the PHH SSA, breach

of Section 1.06(b) of Amendment No. 1, and bad faith misconduct.  To date, PHH has refused to indemnify Celink.

246.     Accordingly, Celink is entitled to an order compelling PHH to indemnify Celink for all of its losses and damages, plus additional costs, expenses, and disbursements, including its reasonable fees and expenses of counsel in bringing and maintaining this lawsuit caused by PHH's actions as alleged herein.

## COUNT X
## UNJUST ENRICHMENT

247.     Celink incorporates by reference each and every allegation contained in Paragraphs 1 through 246, as if fully set forth herein.

248.     PHH has been unjustly enriched in the form of revenue it has earned by subservicing loans on behalf of WAM and MAM because it wrongfully and deceptively diverted the subservicing business that generated these revenues away from Celink to the RMS Platform, for PHH's own benefit.

249.     PHH has been unjustly enriched in the form of revenue earned by subservicing loans on behalf of WAM and MAM because PHH could not have obtained this business but for its breach of Section 8.07(b) of the PHH SSA and Section 1.06(b) of Amendment No. 1, and other bad faith conduct alleged herein.

250.     According to Ocwen's (PHH's parent) 2022 Form 10-K, PHH collected "$9.2 million in subservicing fees related to the MAM (RMS) reverse subservicing portfolio acquired" by PHH.

251.     But for PHH's wrongful actions alleged herein, PHH would not have collected any subservicing revenue in 2021.

252.     But for PHH's wrongful actions, Celink would have earned all of the revenue that PHH has collected from subservicing loans on behalf of WAM and MAM.

253.     PHH's retention of the revenue it has collected or will collect from business it has wrongfully diverted, or will wrongfully divert, away from Celink to itself would offend equity and good conscience.

254.   Accordingly, Celink is entitled to an award equal to all revenue PHH has earned and will earn in the future from subservicing loans on behalf of WAM and MAM or their affiliates, plus any other subservicing business PHH has wrongfully procured in violation of its restrictive covenants with Celink.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Celink hereby demands a trial by jury and respectfully prays for the following relief:

- that Celink be awarded judgment on each and every one of its claims alleged herein;
- for reformation of Amendment No. 1;
- for compensatory damages, in an amount to be proven at trial;
- for punitive damages, in an amount to be proven at trial;
- for rescission of Amendment No. 1, as an alternative remedy;
- for disgorgement of PHH's profits due to PHH's wrongful acts;
- for an award equal to the revenue from which PHH has been unjustly enriched;
- for diminution in Celink's franchise value;
- for the total amount of Celink's costs of suit, expenses, and attorneys' fees incurred herein;
- for pre-judgment and post-judgment interest to the maximum extent permitted by law; and
- any other relief the Court deems just and proper.

Dated: March 3, 2023                      K&L GATES LLP


                                          By: /s/ Matthew G. Ball
                                              Matthew G. Ball
                                              Amy Wong
                                              Andrew J. Wu

                                          *Attorneys for Plaintiff*
                                          *Compu-Link Corporation, dba Celink*

FIRST AMENDED COMPLAINT