UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Compu-Link Corporation, doing business as Celink, a Michigan Corporation,<br><br>Plaintiff,<br><br>v.<br><br>PHH Mortgage Corporation, a New Jersey Corporation,<br><br>Defendant. | No. 2:22-cv-00983-KJM-KJN<br><br>ORDER |

Defendant PHH Mortgage Corporation moves to dismiss plaintiff Compu-Link Corporation's complaint under Rule 12(b)(6). As explained in this order, the court has already permitted several claims to proceed and does not revisit that decision. Most of the complaint's remaining claims, but not all, are supported by sufficient factual allegations, so the motion is **granted in part with leave to amend in part**.

I.     **ALLEGATIONS**

Compu-Link Corporation, which does business as Celink, specializes in subservicing reverse mortgages. For purposes of this order, it is not necessary to explain Celink's business in detail; it is enough to say Celink provides loan-related services to clients who do not or cannot perform those services themselves. *See, e.g.*, First Am. Compl. ¶¶ 19–22, ECF No. 50. This case is about three former Celink clients. The first is PHH Mortgage Corporation, the defendant in

1

1   this action. *See id.* ¶¶ 4, 25–26, 30–31. The second is Waterfall Asset Management, which is not
2   a party. *See id.* ¶¶ 33–34, 36. The third, Mortgage Assets Management, also not a party, is a
3   joint venture between Waterfall and Celink itself. *See id.* ¶¶ 35, 37–41. In 2019, the joint venture
4   made a successful bid to purchase the assets of one of Celink's former competitors. *Id.* ¶¶ 51–52.
5   As a result of that sale, the former competitor became a subsidiary of the joint venture. *See id.*
6   One of the purchased assets was a "platform" that could perform the same service that Celink
7   offers its own clients. *See id.* In sum, the three former clients are PHH, Waterfall and the joint
8   venture, whose subsidiary is a former Celink competitor.
9         At about the same time the joint venture was purchasing the former Celink competitor,
10  Celink began negotiations with PHH over a new subservicing agreement; their existing contract
11  was set to expire within a few months. *See id.* ¶¶ 28–32, 79. These contracts can take months or
12  years to negotiate, so Celink sent PHH a proposal several months ahead of the day their current
13  contract would expire. *See id.* ¶¶ 79–80. Eventually, after more than four months of silence,
14  PHH told Celink it was looking into whether it could service its own reverse mortgages. *See id.*
15  ¶ 81. Later, in June 2020, with less than a month remaining on the existing contract, PHH
16  confirmed it would indeed service its own reverse mortgages eventually, but its new system
17  would not be ready for a year or more. *See id.* ¶ 85. It asked Celink for a short-term contract to
18  bridge the gap. *See id.*
19        PHH's request posed two problems. First, a short-term contract might not be profitable to
20  Celink. *See id.* ¶ 91. Second, the existing contract between Celink and PHH had a non-compete
21  provision that could have the effect of barring PHH from servicing its own loans. *See id.* ¶¶ 29,
22  85. PHH and Celink began discussing how to deal with these problems. While these negotiations
23  with PHH were ongoing, the two other Celink clients introduced above—Waterfall and the joint
24  venture—suddenly demanded that Celink transfer control over thousands of loans to the joint
25  venture's subsidiary, i.e., the former Celink competitor. *See id.* ¶¶ 57, 89. Celink received this
26  demand the same day it received a long-awaited draft agreement from PHH. *See id.* ¶¶ 88–89.
27  Celink later came to suspect this was no coincidence. *See id.* ¶¶ 90, 93.

Celink and PHH's negotiations continued, and they eventually agreed to the basic terms of a new short-term arrangement. First, rather than signing a new contract, Celink and PHH would amend their existing agreement by extending its term by eighteen to twenty-four months. *Id.* ¶ 99. Second, forty-five days' notice would be required to terminate the amended agreement. *Id.* Third, the amended agreement would relieve PHH from its strict obligation not to compete with Celink, but PHH would still be barred from soliciting Celink's other clients. *Id.* That is, Celink and PHH agreed PHH would service only its own loans internally; it would not compete for Celink's clients. *See id.*

Although these basic terms were set, negotiations continued down to the wire. *See id.* ¶¶ 101–102. Two days before the deadline, PHH sent Celink a new draft agreement with many proposed revisions they had not already discussed. *See id.* ¶ 101. In the last-minute scramble that then ensued, someone—the complaint does not say who—changed the non-solicitation provision. Before the change, the provision looked like this:

> During the Term of this Agreement, neither [PHH] nor any of its affiliates shall solicit then-existing reverse mortgage subservicing clients of Celink to provide reverse mortgage servicing or subservicing services.

*Id.* ¶ 96. After the change, the provision was five words longer:

> During the Term of this Agreement, neither [PHH] nor any of its affiliates shall solicit then-existing reverse mortgage subservicing clients of Celink to provide reverse mortgage subservicing services *with respect to the Loans*.

*Id.* ¶ 103 (emphasis in original). The word "Loans" is a defined term. It refers to the loans that Celink was handling for PHH. *See* Mem. at 4, ECF No. 51-1; Opp'n at 9–10; First Am. Compl. ¶¶ 136–40. For that reason, the phrase "with respect to the Loans" gave the non-solicitation provision almost the opposite meaning of what the parties had previously discussed: rather than promising not to steal Celink's clients for itself, PHH was promising not to ask Celink's clients to step into Celink's shoes as the subservicer of PHH's loans.

Celink did not discover this change until after the amendment was finalized and executed. *Id.* ¶¶ 102–03. It does not know who made the change or why. *See id.* ¶¶ 103–04, 138. It claims

3

the change was an obvious clerical mistake—a "scrivener's error." *Id.* ¶ 139.  To Celink, the final non-solicitation agreement makes no sense as written.  Celink provides a specialized service to businesses that do not or cannot perform that service on their own.  Why would PHH hire a Celink client, a business that does not or cannot service its own loans, to provide that same service for PHH?  *See id.* ¶¶ 104, 131–40.  Celink also alleges the mistake was mutual: the parties never intended to bar PHH from asking Celink's clients to take its place; they intended to confirm PHH would not compete for Celink's clients.  *See, e.g.*, *id.* ¶¶ 99–100.

Over the same period Celink and PHH were negotiating their amended agreement, Celink's disagreements with Waterfall and the joint venture client multiplied.  The number of disputed loans grew from 14,000 to 25,000.  *Id.* ¶ 57.  Celink alleges its contract with Waterfall gave it "no choice" but to relinquish control of the loans it was subservicing for Waterfall, but by contrast, Celink refused to transfer away any of the loans it was subservicing for the joint venture; Celink had an exclusive contract right to subservice the joint venture loans.  *Id.* ¶¶ 62–63.  In response to Celink's refusal, the joint venture claimed Celink had not upheld its end of the bargain, it threatened to sue, it withheld and delayed payments and it asked Celink to "assume additional tasks" beyond the parties' agreement.  *See id.* ¶ 64.  The dispute ultimately proved too costly and troublesome, so in May 2021, almost a year after the conflict began, Celink gave up the contested loans.  *Id.* ¶ 66.  It transferred them to the joint venture's subsidiary—the former Celink competitor.  *Id.*

The next month, PHH announced it had agreed to acquire that same subsidiary.  *Id.* ¶ 67.  It would also become the joint venture's exclusive subservicer.  *Id.*  A few months later, the subsidiary acquired a new portfolio of loans, and PHH began to subservice them.  *Id.* ¶¶ 73, 75.  Celink claims it had a right to make the first bid to subservice the loans in that portfolio, but the joint venture did not permit it to submit a bid.  *Id.* ¶¶ 74–76.

Celink has now come to believe PHH was behind Celink's disagreements with Waterfall and the joint venture.  It suspects these three former clients were working together behind the scenes since 2019, when PHH offered to buy Celink's defunct former competitor if it could take over as the exclusive subservicer.  *Id.* ¶ 53.  In other words, Celink alleges PHH's plan was never

4

to develop its own platform to service its own loans; PHH intended all along to acquire Celink's former competitor and compete with Celink directly. *See id.* ¶¶ 53–56. PHH claimed to be developing an internal platform to avoid suspicion and to buy time until it could finalize an exclusive deal with Celink's other two clients. *See id.*

Celink filed this lawsuit against PHH in 2022. *See* Compl., ECF No. 1. The court dismissed portions of Celink's original complaint with leave to amend, *see* Prev. Order, ECF No. 34, and Celink filed an amended complaint late last year, *see generally* First Am. Compl. In the amended complaint it asserts several claims, all under state law. It claims PHH breached its agreement not to compete with Celink, *id.* ¶¶ 118–29; convinced Celink to amend that agreement with false promises about its intentions, *id.* ¶¶ 167–82; and violated its implied covenant to deal fairly and in good faith, *id.* ¶¶ 157–66. Similarly, Celink claims PHH has been unjustly enriched, *id.* ¶¶ 247–54, and it seeks indemnification, *id.* ¶¶ 238–46. Celink also asks the court to reform the non-solicitation provision in the amended agreement to correct the "scrivener's error" described above, *id.* ¶¶ 130–45, and it claims PHH breached the corrected agreement when it sought the business of Celink's two other former clients, *id.* ¶¶ 146–56. Finally, Celink claims PHH wrongfully interfered in Celink's relationships with those two clients, both negligently and intentionally, *id.* ¶¶ 201–37, and induced them to breach their own agreements with Celink, *id.* ¶¶ 183–200.

PHH moves to dismiss all of these claims under Federal Rule of Civil Procedure 12(b)(6). *See generally* Mot., ECF No. 51; Mem. Celink opposes PHH's motion with one exception. *See generally* Opp'n, ECF No. 53.[1] It agrees to dismiss its eighth claim, negligent interference with contract, voluntarily. *See id.* at 21 n.9. The court dismisses that claim without leave to amend. The motion is now fully briefed and the court submitted it without a hearing. *See generally* Reply, ECF No. 56; Min. Order, ECF No. 58.

---

[1] Under this court's standing order, memoranda submitted in support of or in opposition to motions are limited to twenty pages. *See* Standing Order at 3, ECF No. 4-1. Celink's opposition runs two pages over that limit. The court has not considered the arguments in those additional pages.

5

## II. DISCUSSION

A motion to dismiss under Rule 12(b)(6) may be granted if the complaint lacks a "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  The court assumes all factual allegations are true and construes "them in the light most favorable to the nonmoving party." *Steinle v. City & County of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).  If the complaint's allegations do not "plausibly give rise to an entitlement to relief," the motion must be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A number of Celink's claims may be addressed briefly at the outset.  The court has already rejected PHH's arguments for dismissal of Celink's claims for breach of the implied covenant of good faith and fair dealing (claim 4), tortious interference with contract (claim 7), and unjust enrichment (claim 10). *See* Prev. Order at 2–5.  The additional allegations in Celink's current complaint do not undermine the claims it pleaded sufficiently in its original complaint.  The court also permitted Celink to amend its claim for inducement of breach of contract (claim 6) to specify what contract Waterfall breached, *see id.* at 3, and Celink has now included allegations to support its claim that PHH induced Waterfall to breach its contracts with Celink, *see* First Am. Compl. ¶¶ 186, 189, 192, 195–97.  The court declines to revisit these claims.  They may proceed as alleged.

Two of Celink's remaining claims are not necessary to address in detail.  For purposes of this order, they are effectively derivatives of Celink's other claims.  The first of these effectively derivative claims is Celink's allegation that PHH breached the non-solicitation agreement as reformed (claim 3). *Id.* ¶¶ 146–56.  PHH does not advance independent arguments for dismissal of this claim.  It argues only that Celink has not stated a claim for reformation. *See* Mem. at 11–12.  In the second effectively derivative claim, Celink alleges it is entitled to indemnification by contract (claim 9).  First Am. Compl. ¶¶ 238–46.  This claim will stand or fall with Celink's contract claims.

What remains, then, are Celink's claims for breach of the agreement not to compete (claim 1), fraudulent inducement (claim 5) and reformation (claim 2), which the court now discusses in turn.

### A. Breach of the Non-Compete Agreement (Claim 1)

Celink alleges PHH breached the non-compete agreement in the original, unamended agreement by negotiating and signing competing contracts with Waterfall and the joint venture client. *See* First Am. Compl. ¶ 124. Celink alleges PHH engaged in these "Prohibited Activities" before July 2021, when the non-compete provision in the initial contract expired. *Id.* ¶¶ 122–24. PHH announced its new relationship with these former Celink clients in June 2021. *See id.* ¶ 110. The non-compete agreement, however, was deleted almost a year before then, in July 2020. *See id.* ¶ 102. For that reason, Celink could prevail only if PHH began negotiations almost a year before it announced the new contract.

Celink alleges subservicing contracts are commonly negotiated over a period of months or years, and it points out an odd coincidence in timing: Waterfall and the joint venture attempted to terminate their relationship with Celink on the same day PHH first sent Celink a draft amendment of their own agreement. *See* First Am. Compl. ¶¶ 80, 112, 115, 124. Perhaps this was a coincidence. Perhaps not. The complaint does not include any other factual allegations to suggest one possibility is more likely than the other. To withstand a Rule 12(b)(6) motion, a complaint must cross "the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007). Celink's complaint does not cross that line, so its claim for breach of the original non-compete agreement must be dismissed.

Celink advances an alternative theory of breach in a footnote in its opposition brief, *see* Opp'n at 10 n.2, but it did not advance this theory in its complaint, and it cannot amend its complaint by advancing arguments solely in an opposition brief. *See Fabbrini v. City of Dunsmuir*, 544 F. Supp. 2d 1044, 1050 (E.D. Cal. 2008). The motion to dismiss claim one is granted, but with leave to amend if possible.

**B.     Fraudulent Inducement (Claim 5)**

Next, Celink alleges PHH induced it to amend the original contract by falsely claiming to be building an internal system that would service only its own loans. *See* First Am. Compl. ¶¶ 169–75. The California Supreme Court has held a plaintiff may pursue a fraud claim based on a defendant's false description of its intentions. *See Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996). A claim along these lines can rely on the allegation that the defendant fraudulently induced the plaintiff to enter a contract. *See id.* The elements of such a claim parallel those of a fraud claim in general: the defendant made a material misrepresentation, it knew the statement was false, it intended to defraud the plaintiff or to induce the plaintiff's reliance on the misrepresentation, the plaintiff justifiably relied on the misstatement, and the plaintiff suffered damages as a result. *See id.*

In federal court, plaintiffs must plead a fraudulent inducement claim "with particularity." Fed. R. Civ. P. 9(b). "Particularity," as that word is used in Rule 9(b), means the complaint must explain the circumstances of the alleged fraud specifically enough to give the defendants "notice of the particular misconduct" so "they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). A common gloss on this standard explains that a complaint must detail "the who, what, when, where, and how" of the alleged fraud. *E.g.*, *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). Rule 9(b) does not, however, demand specific allegations about a defendant's secret thoughts and desires. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Celink's claim meets the Rule 9(b) standard. It alleges a PHH executive made false statements and withheld information about PHH's intentions at specific crucial moments during their negotiations. *See, e.g.*, First Am. Compl. ¶¶ 169–74. It alleges PHH knew these statements were false. *See id.* ¶ 175. Celink also alleges the false statements were intended to bring it to the negotiating table, and it alleges it relied on the false statements with justification. *See id.* ¶¶ 176, 178. It explains why it believed the false statements, citing the parties' longstanding relationship

and the plausibility of PHH's story, and it explains why the misrepresentations caused damages. *See id.* ¶¶ 178–80. If PHH had disclosed its intent to compete with Celink for its clients' business, then Celink would not have agreed to subservice PHH's loans in the meantime, and it could have spurned PHH's allegedly devious entreaties. *See id.* ¶ 181.

Contrary to PHH's argument, Celink's claims do not rest on allegations that PHH wrongly predicted future events or expressed an opinion. *See* Mem. at 12–13. Celink claims a PHH executive lied about and hid the company's present intentions. *See, e.g.*, First Am. Compl. ¶ 173. A plaintiff can pursue a California-law misrepresentation claim based on an allegation the defendant lied about its intentions. *See Lazar*, 12 Cal. 4th at 639 (holding employee could pursue fraud claim based on allegation the defendant employer "induce[d] him to come to work in California" by intentionally and falsely telling him "he would be employed by the company so long as he performed his job, he would receive significant increases in salary, and the company was strong financially"). The court **denies** the motion to dismiss claim 5.

C. **Reformation (Claim 2)**

Celink's reformation claim withstands PHH's motion as well. Under California law, if "a written contract does not truly express the intention of the parties, it may be revised . . . so as to express that intention." Cal. Civ. Code § 3399. A California Court of Appeal has described the "classic reformation case" as one in which the parties agree to one thing but write another by mistake, "such as a scrivener's error." *Pac. Gas & Elec. Co. v. Superior Ct.*, 15 Cal. App. 4th 576, 593 (1993), *abrogated in part on other grounds by Advanced Micron Devices v. Intel Corp.*, 9 Cal. 4th 362 (1994). A plaintiff must present evidence to demonstrate what the "actual agreement" was before the court can correct the error. *Id.*

Just as in the case of an alleged fraud, a plaintiff must state the circumstances of an alleged mistake with "particularity." Fed. R. Civ. P. 9(b). This rule is easier to justify in the case of an alleged fraud than a mutual mistake. In the case of an alleged fraud, the particularity requirement might ward off unfounded accusations that could wrongly sully a defendant's reputation, especially in a professional or competitive setting. *See, e.g.*, *Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992); *Semegen v. Weidner*, 780 F.2d 727, 731

9

(9th Cir. 1985). The same might be true in cases of an allegedly unilateral mistake, i.e., when the plaintiff alleges the defendant knowingly took unfair advantage of the plaintiff's mistake. *See, e.g.*, *Pac. Gas & Elec.*, 15 Cal. App. 4th at 593 (discussing this type of claim). But an unfounded claim that everyone was mistaken does not risk the defendant's reputation in the same way, if it does at all.

Another justification for the particularity rule rests on a defendant's need to "defend against the charge" with more than flat denials. *Kearns*, 567 F.3d at 1124 (quoting *Bly-Magee*, 236 F.3d at 1019). In a fraud case, specific allegations about who said what, when and in what circumstances are necessary to identify the allegedly fraudulent statement or omission and why it was false or misleading. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), *superseded in part on other grounds as recognized in Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001). By contrast, it is unclear why a defendant could not understand or refute a claim of mutual mistake if the complaint offers "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face,'" as every complaint must, even those that do not allege any frauds or mistakes. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). For a complaint to meet that more general standard, the necessary "factual matter" would include an explanation of what the parties intended, what was written and what the mistake was. *See, e.g.*, *Philips Med. Cap., LLC v. Med. Insights Diagnostics Ctr., Inc.*, 471 F. Supp. 2d 1035, 1046–47 (N.D. Cal. 2007). It is not entirely clear what additional or more particularized information could be necessary to permit a meaningful defense.

Precedent does not offer much guidance on applying Rule 9(b) in cases of an allegedly mutual mistake. The parties have cited no binding authority, and the court has located none. Federal district courts have not demanded much particularity in other similar cases about other states' analogous reformation laws. It has ordinarily been enough for a complaint to identify the alleged error and offer some additional information to explain the parties' true intentions.

Examples of this other information include "other sections of the contract,"[2] email exchanges,[3] a history of the parties' negotiations,[4] other agreements that did not make the same mistake,[5] and specifics about what situations the parties intended to address, but did not.[6] Complaints have fallen short in cases of obvious omissions, such as omitting the terms of the parties' actual agreement from the complaint[7] or not alleging whether the mistake was mutual or unilateral.[8]

In the absence of any binding authority, some district courts have adopted California's rules for pleading mutual mistake. *See, e.g.*, *Barboza*, 2010 WL 2629879 at *4; *Philips*, 471 F. Supp. 2d at 1046–47. The most commonly cited rule traces its roots to a 1916 decision by the California Supreme Court and to a practice guide published a few years earlier:

> The complaint should allege "what the real agreement was, what the agreement as reduced to writing was, and where the writing fails to embody the real agreement." . . . It is necessary to aver facts showing how the mistake was made, whose mistake it was, and what brought it about, so that the mutuality may appear.

*Auerbach v. Healy*, 174 Cal. 60, 62 (1916) (quoting and citing 34 Cyc. Law & Proc. 974 (1910)). Of course, California's procedural rules do not supplant the Federal Rules of Civil Procedure in general, nor Rules 8(a) and 9(b) specifically. *See, e.g.*, *Vess*, 317 F.3d at 1102–05. But the state's pleading rules confirm the basic elements of a viable claim for reformation. In that way, the state's rules do illustrate what a plaintiff must allege to satisfy Rules 8 and 9.

After reviewing the authorities cited above and in the parties' briefs, the court concludes that a plaintiff who requests reformation under California Civil Code section 3399 based on a

---

[2] *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 441 (E.D.N.Y. 2011).

[3] *Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, 724 F. Supp. 2d 407, 417–18 (S.D.N.Y. 2010).

[4] *4 BAB LLC v. Beacon Health Options, Inc.*, No. 19-00889, 2020 WL 409788, at *7 (N.D.N.Y. Jan. 24, 2020).

[5] *Johnson v. Pa. Nat'l Mut. Cas. Ins. Co.*, 447 F. Supp. 3d 372, 383 (D. Md. 2020).

[6] *Watermark Constr., L.P. v. S.-Owners Ins. Co.*, No. 17-1814, 2018 WL 1305913, at *5 (M.D. Fla. Mar. 13, 2018).

[7] *Barboza v. Deutsche Bank Sec., Inc.*, No. 10-0559, 2010 WL 2629879, at *4 (E.D. Cal. June 29, 2010).

[8] *Harper Constr. Co., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 18-00471, 2020 WL 1820124, at *10 (S.D. Cal. Apr. 10, 2020); *Philips*, 471 F. Supp. 2d at 1047.

claim of mutual mistake can satisfy Rules 8(a) and 9(b) by alleging what the parties intended, what mistake they made in their written agreement, whose mistake it was and how that mistake came about. Celink's complaint meets that standard. It alleges Celink and PHH agreed to replace their non-compete agreement with a non-solicitation agreement; they intended for the non-solicitation agreement to permit PHH to develop its own internal system to service its own loans on the one hand, but on the other, PHH could not attempt to lure away Celink's own clients with offers to subservice the clients' loans. Celink alleges language was added to the written agreement by the parties' mutual mistake during a last-minute scramble, and it explains how the addition changed the written agreement's meaning. The complaint also includes allegations corroborating Celink's claims about the parties' true intentions. For example, Celink alleges the written agreement, i.e., the agreement including the mistake, rests on the counterintuitive premise that PHH would ask Celink's clients to perform a service for PHH that they had chosen not to perform for themselves. For its part, PHH argues the written agreement actually makes good sense, *see, e.g.*, Mem. at 10–11, but at this early stage, the court must draw inferences in Celink's favor. For these reasons, the court **denies** the motion to dismiss Celink's reformation claim.

## III.  CONCLUSION

The motion to dismiss is granted in part with leave to amend in part:

- Claim 1 is **dismissed with leave to amend**;
- Claim 8 is **dismissed without leave to amend**;
- The motion is otherwise **denied**.

Any further amended complaint must be filed **within twenty-one days**.

IT IS SO ORDERED.

DATED: May 12, 2023.

_____
CHIEF UNITED STATES DISTRICT JUDGE